# D. T. PHILLIPS v. ROY K. BLOWERS.

161 N. W. (2d) 524.

August 30, 1968—No. 40,586.

*Nolan, Alderman & Holden* and *Richard H. Breen,* for appellant.
*Ryan, Ryan & Ebert* and *C. A. Ryan,* for respondent.

PETERSON, JUSTICE.

Plaintiff and defendant, owners of adjoining platted lakeshore property in Crow Wing County, are in dispute as to the location of their common boundary. The issue erupted into litigation when, on August 18, 1964, defendant erected a fence upon what he claimed to be the "true and correct property line" as determined by adverse possession and "practical location and user" for more than 15 years. Judgment was ordered for defendant.

The trial court found, resolving an issue of fact, that such common

boundary was not established by defendant's adverse possession to the line of the disputed fence. It found and concluded, "largely [as] questions of law,"[1] however, that defendant and plaintiff's predecessor in title had agreed upon that common boundary and that "both acquiesced in the assumption" that the line of the fence, which lay between tree lines previously planted by them, was the boundary line. Plaintiff, appealing from the order denying his alternative post-trial motion for judgment in his favor or for a new trial, contends that the court's adverse findings lack adequate support in the evidence.

The disputed tract of land, by way of general description, is platted land located on Pleasant Lake in Crow Wing County. The plat, known as Cross Lake Park, is based upon a survey of Government Lot 3, sec. 19, T. 137, R. 27, made by one Louis Knudson, the county surveyor, in 1927. Block 1 of the plat includes Lots 5, 6, 7, and 8, which run north to south. Defendant is the owner of Lots 5 and 6, and plaintiff is the owner of Lots 7 and 8. The west end of Lots 6, 7, and 8 and the southwest corner of Lot 5 front on Pleasant Lake; the east, or rear, ends of the lots are bounded by a highway.

The specific dispute relates to the common boundary of Lot 6, owned by defendant, and Lot 7, owned by plaintiff. According to the plat, the lots are somewhat rectangular, with the following dimensions: Lot 6 is 100 feet on the west (lakeshore), 135 feet on the east, 405 feet on the north (its common boundary with Lot 5), and 355 feet on the south (its common boundary with Lot 7); and Lot 7 is likewise 100 feet on the west (lakeshore), 140 feet on the east, 305 feet on the south (its common boundary with Lot 8), and 355 feet on the north (its common

---

[1] Plaintiff made a pretrial motion for jury trial. The motion was denied, pursuant to Rules 38 and 39, Rules of Civil Procedure, and is not now in issue. In deciding not to use an advisory jury, however, the court observed, in a memorandum made a part of its order, that "[a]fter all, the matters here involved will be largely questions of law." This memorandum was re-incorporated in a memorandum made a part of the court's order denying plaintiff's post-trial motion, with the observation that "that question is now moot inasmuch as this Court in its findings found against Defendant on the only issue of fact which might possibly have constituted a jury issue namely adverse possession."

boundary with Lot 6). The effect of the decision establishing the disputed fence as the common boundary would radically alter the platted boundary and reduce the lakeshore frontage of Lot 7 to no more than 53 feet.

Because the crux of the case is defendant's claim that the common boundary was established by practical location and user, we preface the discussion by recalling, as first stated in Beardsley v. Crane, 52 Minn. 537, 545, 54 N. W. 740, 742, and more recently reiterated in Engquist v. Wirtjes, 243 Minn. 502, 506, 68 N. W. (2d) 412, 416, that the practical location of a boundary line can be established in only three ways:

(1) *Acquiescence or adverse possession.* The location relied upon must have been acquiesced in for a sufficient length of time to bar a right of entry under the statute of limitations.[2]

(2) *Agreement.* The line must have been expressly agreed upon between the parties claiming the land on both sides thereof, and afterwards acquiesced in.

(3) *Estoppel.* The parties whose rights are to be barred must have silently looked on with knowledge of the true line while the other party encroached upon it, or subjected himself to expense in regard to the land, which he would not have had the line been in dispute.[3]

We recall, too, the nature of the proof with which defendant, in asserting that the boundary has been established by practical location, is burdened. The evidence establishing a boundary by practical location, as we have consistently held since Beardsley v. Crane, 52 Minn. 537, 546, 54 N.W. 740, 742, must be "clear, positive, and unequivocal." We said in Village of Newport v. Taylor, 225 Minn. 299, 303, 30 N.W. (2d) 588, 591, with reference to practical location by adverse possession, that it may be established "only by clear and positive proof based on a strict construction of the evidence, without resort to any inference or presump-

---

[2] The principle of adverse possession is expressly embodied in Minn. St. 541.02. The elements of "adverse possession" are, it would seem, distinguishable from "acquiescence" but are the same in so far as either must exist for a period of 15 years.

[3] No claim is made that the common boundary was established by principles of estoppel.

tion in favor of the disseizor, but with the indulgence of every presumption against him."

Defendant acquired Lots 5 and 6 in October 1944 and built his home on Lot 5. Plaintiff acquired Lots 7 and 8 in 1962 from one Gates, now deceased, and apparently built his home on Lot 8. Lots 6 and 7 are vacant and have been left in "wild" state. Defendant made no use of Lot 6 other than to remove some trees, mostly deadfall, for firewood; and, without objection from Gates or plaintiff, he also cut trees, including some live trees, in the disputed area of Lot 7 from about the time that he acquired his lots and until shortly before the onset of litigation, although such cutting apparently did not occur in the most valuable, west-end portion. On the other hand, defendant never erected any structure on Lot 6 or the disputed portion of Lot 7 and made no objection when Gates tore down an old outhouse that stood in the disputed portion of Lot 7. It was not until 1964, when plaintiff's wife cut grass in the disputed area of Lot 7, that defendant told her that this was his property. Shortly thereafter he erected the disputed fence as a positive assertion of his boundary claim.

Although defendant, "in passing," continues to assert that the evidence would establish his title by adverse possession, we agree that the evidence fell far short of establishing either acquiescence or such an open, hostile, continuous, and exclusive claim of right for a period of 15 years as would establish the boundary by such method of practical location.

The real basis of the trial court's decision is that defendant and Gates, as plaintiff's predecessor in title, had expressly agreed upon such common boundary and had afterwards acquiesced in it for a substantial period of time. The evidence would indeed establish that defendant and Gates had made a two-stage agreement relating to their common boundary. First, they had in 1946 agreed upon a definite point as the northeast corner of Lot 7. This agreement occurred as a result of Gates' request that defendant move the road leading into his premises from the highway because it passed over Lot 7. Gates and defendant thereupon placed an iron pipe at a point 10 feet south of the platted north line of

Lot 7 and 20 to 30 feet west of the highway. There would seem to be no dispute, therefore, that this constituted the new monument of the northeast corner of Lot 7 and would take precedence over any monumented corner previously fixed in the survey of the plat.

The second agreement, more important but far less definite in character, related to the whole of the fence line, extending from that new corner to where the eastern end of the fence now stands some 15 feet back from the lakeshore. According to defendant, *Gates* expressed the desire to place a fence along the approximate line now in dispute but defendant suggested that each party should, as they instead did, plant trees 4 feet to the north and south, respectively, of the line proposed by Gates. According to defendant, the planting of trees started in about 1951; but an employee of the State Division of Forestry testified that the oldest trees in these plantings were 13 to 14 years old as of the date of the trial in 1966, which would place the commencement of the planting somewhat later. Gates and defendant apparently abandoned such agreement in 1959 after a resurvey by the county surveyor indicated that such line was actually on Gates' Lot 7. The abandonment of their agreement is apparent from the fact that defendant offered to buy the now-disputed piece of land from Gates, conduct inconsistent with continued agreement and acquiescence that the common boundary was along that line. The admitted reason for defendant's not purchasing the land from Gates was simply that the price fixed by Gates was too high, and, significantly, no trees were thereafter planted by the parties either to the north or south of the line. The line itself, falling within an 8-foot space between two incomplete rows of trees and not otherwise clearly expressed by any positive act of possession, was rather ambiguous; and the acquiescence in it was likewise ambiguous.[4] We hold that this ambiguous evidence of agreement and acquiescence was insufficient to establish practical location of such common boundary as a matter of law.

We do not, in so holding, ignore the court's finding that the disputed

---

[4] Although the legal significance of acquiescence subsequent to express agreement is not at all clear in the cases, except possibly as evidence of such agreement, such acquiescence, like the agreement, existed for no more than 8 years.

fence stands precisely upon the "true" boundary established in the original survey of the plat. If such a finding were sufficiently supported by evidence qualitatively equivalent to a competent survey, it would probably determine the boundary issue without resort to principles of practical location. Defendant himself, however, did not assert his claim on that basis but, rather, on the basis of practical location notwithstanding the true line of the plat. In this context, the only purpose of the finding would be to make definite the otherwise ambiguous line upon which the parties had once agreed and in which for a few years they had subsequently acquiesced, at least if it could be found that they had reached their agreement by mutual reference to it. A comparison of the circumstances upon which the court made its finding of true boundary with the contrary result of three resurveys demonstrates to us, however, the frailty of such a finding for any purpose.

Defendant testified, first, that at the time of purchasing Lot 6 in 1944 he had walked the boundary between Lots 6 and 7, that he had then noticed square wood markers labeled with lot numbers at the four corners of each lot, and that he had observed that the boundary lines were clearly brushed out. The disputed fence, the court found, was along the brushed-out line. Even though his testimony as to the existence of such wood lot-markers and his claim that the line where the fence now stands was at that time clearly brushed out was not without corroboration,[5] there was no direct evidence that the wood stakes were in fact the original survey stakes or that the brushed-out area was made in the original survey.[6]

---

[5] Defendant's former business partner, the partner's brother, and a neighbor related to defendant by marriage testified that the lines were brushed out in 1944. Another resident owner of land in Cross Lake Park testified, on the contrary, that there were no brushed-out lines observable in either 1943 or 1945.

[6] Seventeen years would seem to be a long time for brushed-out lines to remain visible or for wood lot-markers to remain plainly distinguishable. It is known that defendant's predecessor, one Stimson, had subsequently been actively engaged in selling Cross Lake Park lots to various persons. It may be speculated that Stimson for such purposes had himself placed more legible markers to replace the weathered wood markers, but it would be

Second and similarly, defendant placed the western-most point of the disputed fence at a point which, by his own measurement, he fixed as the southwest corner of Lot 6 and, accordingly, the northwest corner of Lot 7. Defendant testified that the wood surveyor's stakes had disappeared through the years and that sometime in the period between 1949 and 1951 he replaced a survey marker at the northwest corner of Lot 6 with an iron pipe. He then simply measured 100 feet south from that pipe and, on the basis of his unilateral measurement, thereafter placed the western end of his fence to mark the common southwest corner of Lot 6 and northwest corner of Lot 7. There was, again, no substantial evidence in the record to establish that the wood stake purportedly replaced was the stake placed in the original survey of the plat and there was no corroboration of defendant's testimony that, even assuming it were, his iron pipe was an accurate replacement of it. The court, on the basis of this unattested act of defendant, found that the mark was "in the exact position of a wooden lot stake placed by [the county surveyor in 1927]."

The results of resurvey of Lot 7 stand in substantial contradiction to such findings of actual location based on such inherently unreliable evidence. Dean Anderson, presently the Crow Wing County Surveyor and formerly the deputy to the county surveyor who had made the survey for the Cross Lake Park plat, made resurveys of the boundaries of Lot 7 in 1957, 1959, and 1965. Anderson's technical qualifications as a civil engineer and registered land surveyor are admitted and the technique of his resurveys is not effectively challenged.[7] The trial court acknowledged that the Anderson survey was perhaps "technically correct." Anderson located several permanent monuments from the original plat and, by running the recorded courses and distances within the plat from such es-

equally speculative to indulge the assumption, for title purposes, that Stimson had placed them in precisely the same place as the original markers.

[7] It was apparently the 1959 survey made by Anderson which resulted in the abandonment of the prior agreement between defendant and Gates, plaintiff's predecessor in title, relative to the common boundary and their subsequent negotiation for the purchase of the disputed land from Gates by defendant.

tablished monuments, ascertained the boundaries of Lot 7. Proof that those monuments were originally there when the first survey was made was supplied by Anderson's unquestioned testimony that the distances and directions of the lines between the found monuments matched like data in the field notes and other documentation of the original survey of the plat. These surveys showed the platted lakeshore frontage of Lot 7 as 100 feet. They disclosed, however, that the diagonal fence line measured south from Lot 6 to a point on which stands the western end of the fence, would reduce the lakeshore frontage of Lot 7 to no more than 53 feet. But because that point is some 15 feet back from the shore line an extension of that diagonal line would reduce the lakeshore frontage even more. Of course, if the court did not intend to find an extension of the boundary beyond the length of the fence itself, the ambiguity and incompleteness of the original agreement upon a common boundary between defendant and Gates would be yet again manifest.

We have in at least two cases had occasion to consider the relevance and evidentiary weight to be accorded a resurvey of property in resolving boundary disputes. Both, coincidentally, involved boundary disputes as to lakeshore property. In Gifford v. Vore, 245 Minn. 432, 72 N.W. (2d) 625, a common boundary was claimed on the basis of practical location, but we held that the trial court was justified in holding that the boundary claimed by practical location had not been established by clear and convincing evidence because of the claimant's failure to furnish an up-to-date survey. In Aldrich v. Wilson, 265 Minn. 150, 120 N.W. (2d) 849, we noted that the boundary dispute grew out of the failure of the claimant's predecessor to have a survey made at the outset and we held that, to the extent the claim was asserted upon the basis of a subsequent survey, it was for the trial court to determine, as a matter of fact, which of two inconsistent surveys was correct, recognizing that differences in the methods of surveyors may yield different results. We do not hold that in this case the result of the Anderson surveys was determinative of the boundary dispute, even though its technical correctness is essentially undisputed. A boundary clearly and convincingly established by practical location may still prevail over the contrary result of survey. We think, however, that where the establishment of a

boundary to valuable land, particularly platted land, may be seriously incompatible with the beneficial use of such land and where such boundary is substantially at variance with the original boundary, evidenced by a technically competent survey, a disputed boundary should not be deemed established by practical location except upon evidence that is truly clear and convincing. The trial court did not assess the evidence in such terms. Resorting to "the old adage about letting sleeping dogs lie," it considered that the practical location asserted by defendant was established largely as a matter of law.

We think plaintiff is accordingly entitled to a new trial. In such retrial defendant, however, is not foreclosed from adducing further evidence relevant to any of the three ways of establishing a boundary by practical location.

Reversed and new trial granted.