Frank THEROS, et al., Appellants,

v.

Elly PHILLIPS, Individually, and as Trustee of the Trusts Created under the Last Will and Testament of Nicholas B. Phillips, Deceased, Respondent.

No. 46732.

Supreme Court of Minnesota.

July 15, 1977.

Mastor & Mattson and Charles A. Bassford, Jr., and Richard J. Gunn, Minneapolis, for appellants.

Leonard, Street & Deinard and Morris M. Sherman and Stephen J. Davidson, Minneapolis, for respondent.

Heard before MacLAUGHLIN, SCOTT, and STAHLER, JJ., and considered and decided by the court en banc.

MacLAUGHLIN, Justice.

This is an action arising out of a dispute between adjacent property owners involving the location of the boundary line separating their premises. Plaintiffs, Frank, Eugenia, George, and P. Robert Theros, and Kings Inn, Inc., sued defendant, Elly Phillips, seeking an order of the district court (1) to reform the legal description of the boundary line as contained in a deed dated August 4, 1941, to reflect what plaintiffs maintain was the true intent of the parties to that deed; or, in the alternative, (2) to have the boundary line judicially determined pursuant to Minn.St. 559.23.[1] Defendant counterclaimed seeking a permanent injunction[2] to restrain allegedly repeated trespasses by plaintiffs upon her property and alleged interference by plaintiffs with her enjoyment of an easement which she previously had been granted over their property.

After trial without a jury, the district court issued its findings of fact, conclusions of law, and order for judgment denying in its entirety the relief sought by plaintiffs. The trial court failed to rule on defendant's counterclaim for permanent injunctive relief and denied her motion for amended and additional findings in that respect. Judg-

1. Minn.St. 559.23 reads as follows: "An action may be brought by any person owning land or any interest therein against the owner, or persons interested in adjoining land, to have the boundary lines established; and when the boundary lines of two or more tracts depend upon any common point, line, or landmark, an action may be brought by the owner or any person interested in any of such tracts, against the owners or persons interested in the other tracts, to have all the boundary lines established. The court shall determine any adverse claims in respect to any portion of the land involved which it may be necessary to determine for a complete settlement of the boundary lines, and shall make such order respecting costs and disbursements as it shall deem just.

The decree of the court shall be filed with the clerk, and a certified copy thereof shall be recorded in the office of the county recorder or filed in the office of registrar of titles or both, if necessary; provided that such decree shall not be accepted for such recording or filing until it shall be presented to the county auditor who shall enter the same in the transfer record and note upon the instrument over his official signature the words 'ENTERED IN THE TRANSFER RECORD.'"

2. Defendant was awarded a temporary injunction by the district court pending a final determination of the case on its merits.

ment was entered in favor of defendant and against plaintiffs on their claims for relief. Plaintiffs have appealed from that judgment and defendant has filed a notice of review [3] seeking review of the district court order denying her motion for amended and additional findings of fact relating to her right to permanent injunctive relief.

The specific transactions leading to this dispute took place over a period of 3 decades. A complete statement of all the facts would be detailed and lengthy, and to repeat all of them would serve little purpose. Instead, we will recite only the most crucial aspects of those transactions.

In the spring of 1940 Nicholas B. Phillips, defendant's husband, purchased the entire tract of land located in the northeast quadrant of the intersection of State Trunk Highway No. 100 and Excelsior Boulevard in St. Louis Park, Minnesota.[4]

In 1941 Phillips formed a corporation, Lilac Lanes Company, Inc. (Lilac Lanes), for the purpose of constructing, owning, and operating a bowling alley and restaurant on the northern portion of the tract. Apparently prior to the commencement of construction by Lilac Lanes, Phillips divided the property by survey and by deed based thereon. That deed conveyed the northern portion [5] of the tract to Lilac Lanes on August 4, 1941. In both the deed and survey a certain line, 434 feet long, was denoted as the boundary between the northern and southern parcels carved out of the tract. Sometime in 1941, subsequent to the division of the property and subsequent to the commencement of construction on the northern parcel, plaintiff Frank Theros purchased an interest in Lilac Lanes.

On October 9, 1941, out of an apparent need to finance construction of the bowling alley and restaurant, Lilac Lanes executed a mortgage on the northern parcel. While there is no evidence in the record of precisely when the actual construction on the northern parcel commenced, presumably the mortgage was granted before or at the time of the first visible improvement.[6] The

---

3. Under the provisions of Rule 106, Rules of Civil Appellate Procedure.

4. The legal description of the entire tract as contained in Phillips' May 31, 1940, deed of purchase was as follows: "That part of Section Seven (7), Township Twenty-eight (28), Range Twenty-four (24) described as follows, to-wit: Commencing at the Southwest corner of the Northwest Quarter of the Northwest Quarter (NW¼ of NW¼); thence North four hundred eighty-eight and eight-tenths (488.8) feet; thence North 76° East 140 feet; thence North to a point 443.71 feet South of North line of section; thence East 488.66 feet; thence South to a point 493.12 feet North of center line of Excelsior Ave.; thence southwesterly parallel with Excelsior Ave. 193.47 feet; thence at right angles southeasterly to a point 130 feet northwesterly from northwesterly line of said Ave.; thence at right angles southwesterly 60 feet; thence at right angles southeasterly to center line of Excelsior Ave.; thence southwesterly along same to South line of Northwest Quarter of Northwest Quarter (NW¼ of NW¼); thence West to beginning except part taken for State Highway."

5. It is this deed of August 4, 1941, between Phillips and his wife, the defendant, as grantors, and Lilac Lanes, as grantee, that plaintiffs seek to reform. That deed contained the following legal description of the northern portion of the tract: "That part of the Northwest Quarter of the Northwest Quarter (NW¼–NW¼) of Section Seven (7), Township Twenty-eight (28), Range Twenty-four (24), described as follows: Commencing at the Southwest corner of the Northwest Quarter of the Northwest Quarter of Section 7; thence North 488.8 feet; thence North 76° East 65 feet to a point in the Easterly line of the right of way of State Trunk Highway No. 100 also known as Belt Line Highway, said last described point being hereinafter described as the point of beginning; thence continuing North 76° East 75 feet; thence North 358 feet to a point 443.71 feet South of the North line of said Section 7; thence East 488.66 feet; thence South 234.95 feet to a point 493.12 feet North of the center line of Excelsior Avenue as originally laid out and established in the Village of St. Louis Park; thence Southwesterly parallel with said center line of Excelsior Avenue 193.-47 feet; thence at a right angle Southeasterly a distance of 214.33 feet; thence in a Southwesterly direction 434 feet to a point on the Easterly line of the right of way of said State Trunk Highway No. 100, also known as the Belt Line Highway, at a point 180.55 feet Southeasterly from the point of beginning; thence in a Northwesterly direction 180.55 feet to the point of beginning."

6. We can take judicial notice of the fact that this is the normal practice in the construction industry because a mortgage must be executed

bowling alley and restaurant were thereafter constructed by Lilac Lanes on the northern parcel in late 1941 and 1942. The area along the boundary line between the northern and southern portions of the original tract became a parking lot.

Lilac Lanes went bankrupt in 1942, and in 1944 the mortgagee foreclosed on the northern parcel. In all of the documents relating to the mortgage foreclosure, the 434-foot line was identified as the boundary separating the northern parcel from the southern parcel. On January 5, 1944, a second corporation by the name of Lilac Lanes Enterprises, Inc. (Enterprises), was organized by Phillips, plaintiff Frank Theros, D. N. Karalis, and John N. Karalis for the purpose of purchasing the northern parcel. A January 1944 mortgage loan survey again showed the 434-foot line as the boundary between the parcels. D. N. Karalis and John N. Karalis quickly withdrew from Enterprises, and their stock was redistributed to Mr. and Mrs. Phillips, Frank Theros, and Theros' wife, Eugenia.

The description in the deed which eventually conveyed the northern parcel to Enterprises in 1952, pursuant to its purchase of the land in 1944 under a contract for deed, also used the same 434-foot line as the boundary, as did a survey conducted in connection with the delivery of the deed.

Phillips died in June 1958 and his interest in Enterprises was devised to a trust, of which defendant, Elly Phillips, was trustee. From 1941 until his death, Phillips had owned the entire southern parcel and had operated the Lilac Way Shopping Center which he had constructed on that parcel.

Following Phillips' death, a deadlock occurred within the board of directors of Enterprises. In 1959, due to certain conflicts between the owners of Enterprises, Frank Theros instituted a lawsuit against defendant. That action was ultimately settled by a stipulation dated December 4, 1959. As part of the settlement, Frank Theros purchased defendant's interest in Enterprises. The settlement documents clearly and graphically depicted the 434-foot line as the boundary between the northern and southern parcels.

The settlement also granted defendant an easement over a narrow strip of the northern parcel, immediately north of and running along the 434-foot line, and again reaffirmed the 434-foot line as the boundary between the northern and southern parcels.

In 1964, Kings Inn, Inc., was organized by plaintiffs George Theros and P. Robert Theros. During that same year, Kings Inn, Inc., leased and assumed management of the restaurant from Enterprises. The bowling alley was closed in 1966.

Various condemnation actions commenced by the State Highway Department in 1966, and by the city of St. Louis Park in 1971 and 1972, again confirmed the 434-foot line as the boundary between the northern and southern parcels.

During Phillips' lifetime there had been no fixed policies as to parking and the entire parking area on both the northern and southern parcels had been used interchangeably for parking by customers of the bowling alley, the restaurant, and the shopping center. From 1959, the time when Theros purchased the full interest in the northern portion of the property, until 1972, the customers of the bowling alley and restaurant continued to park in the shopping center parking lot. This parking occurred with the full knowledge of plaintiffs and extended south beyond the area which plaintiffs have now placed in dispute. On at least six different occasions, defendant's attorneys directed letters to plaintiffs or their attorneys, demanding that parking on the shopping center parking lot by plaintiffs and their customers cease. Since 1960, defendant and her tenants have caused numerous signs, fences, barriers, parking stripes, and chains to be placed on or adjacent to the shopping center parking lot, at or near the 434-foot line, so as to give plain and clear notice that the parking area south of the 434-foot line was for the exclusive

prior to the first visible improvement on the property to be superior to lien rights that may

arise during the construction. See, Minn.St. 514.05.

use of customers of the shopping center. In addition defendant personally complained to plaintiffs' parking attendant because he was directing customers to park their cars south of the 434-foot line.

The problems underlying this lawsuit erupted in May 1972, when a tenant of the shopping center, with the permission of defendant, erected a snow fence on or near the boundary line between the northern and southern parcels over the objections of plaintiffs.

■ 1. A written instrument, including a deed, can be reformed by a court using its equitable powers only when it is proved that (1) there was a valid agreement between the parties expressing their real intentions; (2) the written instrument allegedly evidencing the agreement failed to express the real intentions of the parties; and (3) this failure was due to a mutual mistake of the parties, or a unilateral mistake accompanied by fraud or inequitable conduct by the other party. *Fritz v. Fritz,* 94 Minn. 264, 102 N.W. 705 (1905). See, also, *Theisen's, Inc. v. Red Owl Stores, Inc.,* Minn., 243 N.W.2d 145 (1976); *Cool v. Hubbard,* 293 Minn. 349, 199 N.W.2d 510 (1972).

■ The evidence supporting reformation of a written instrument, including a deed, must be consistent, clear, unequivocal, and convincing. *Fritz v. Fritz, supra; Theisen's, Inc. v. Red Owl Stores, Inc. supra; Golden Valley Shopping Center v. Super Valu Realty,* 256 Minn. 324, 98 N.W.2d 55 (1959).

■ The trial court found, as a finding of fact, after considering both the direct and circumstantial evidence presented at trial that there had been no mistake or error concerning the boundary line between the northern and southern parcels such as would allow reformation. Findings of fact of a district court are not to be set aside unless clearly erroneous, and we have expressly followed that standard of review in cases involving reformation of written instruments. See, *Theisen's, Inc. v. Red Owl Stores, Inc. supra,* and *Cool v. Hubbard, supra.*

■ A review of the record demonstrates that the trial court's finding of no mistake is not clearly erroneous, and that it is amply supported by the evidence. The 1941 survey and the legal description contained in the 1941 deed established the boundary line between the northern and southern parcels as a straight line, measuring 434 feet in length. At all times thereafter, every survey, deed, and mortgage relating to the parcels in question maintained and confirmed the boundary between the northern and southern parcels as the same 434-foot line.

Plaintiffs have only two sets of facts that offer any support to their theory of mistake in the 1941 deed. First, plaintiffs allege that there must have been a mistake in describing the boundary line as it appears in the 1941 deed, at the 434-foot line, because that location leaves the restaurant with little or no parking in front. The argument is that a restaurant without parking in front is such a commercial absurdity that neither Phillips in his capacity as grantor nor Lilac Lanes as grantee could possibly have intended to designate the boundary at the 434-foot line.

The trial court was well within its discretion in failing to be persuaded by that argument. The 1941 deed was apparently executed before construction began on the restaurant and bowling alley. There could hardly have been a mistake about the location of the boundary line in relation to the restaurant when the restaurant was not in existence. Furthermore, it is not necessarily so absurd that Phillips would have provided the restaurant with little or no parking in front. Up until his death, he had an interest in both the restaurant and the shopping center. To allow use of the shopping center parking lot by the restaurant was in his interest as a part owner of the restaurant. In addition, the evidence shows that there always has been, and still is, ample open space to the side and rear of the restaurant to handle its parking needs. The side and rear open space was indeed eventually developed into a parking lot that provides ample room for parking for customers of the restaurant.

Second, plaintiffs argue that while the surveys uniformly show the 434-foot line as the boundary, the restaurant building is not located on certain of the surveys and on two of them, a 1952 mortgage-loan survey and a 1954 mortgage-loan survey, the building is located out of place. The trial court properly could have rejected this argument as well. The evidence established that mortgage-loan surveys do not attempt to place buildings accurately. Given this evidence, the fact that the only two potentially misleading surveys were made long after the 1941 deed, the fact that the record shows no evidence that the 1952 and 1954 mortgage-loan surveys reflected what Phillips thought was the true relationship of the restaurant to the boundary line, and the fact that those surveys actually reaffirmed the 434-foot line as the boundary, the trial court could find that those surveys were inadequate evidence of mistake in the 1941 deed.

■ As we have already stated, in a reformation action the plaintiff, in addition to demonstrating mistake, must prove what the actual agreement was between the parties. See, *Metro Office Parks Co. v. Control Data Corp.* 295 Minn. 348, 205 N.W.2d 121 (1973). The trial court found that no actual agreement existed other than the one contained in the 1941 deed. That finding is amply supported by the evidence. The record demonstrates that plaintiffs did not present consistent, clear, unequivocal, and convincing evidence of a specific and different boundary line. In fact, plaintiffs' evidence tended to place the alleged boundary in several different locations. We affirm the trial court's denial of plaintiffs' request to reform the deed.

2. Minn.St. 559.23 provides for judicial action to establish a boundary line between adjoining lands. The statute itself provides

for the action, but does not specify its underlying theories. The generic term "practical location" is used to describe this type of action. Despite extensive litigation in almost all jurisdictions, courts and commentators do not agree on the theory of practical location, i. e., its nature, scope, and requisite elements. Note, 37 Minn.L.Rev. 382 (1953). The theories of judicial determination of a boundary line underlying plaintiffs' case have not been made completely clear.[7] The trial court treated plaintiffs' claims as ones of adverse possession, acquiescence, agreement, and estoppel. Plaintiffs deny any reliance on adverse possession which is a doctrine different from practical location, so we need not consider that theory.

Minnesota case law specifies that there are only three methods of establishing the practical location of a boundary line:

(1) Acquiescence: The location relied upon must have been acquiesced in for a sufficient length of time to bar a right of entry under the statute of limitations.

(2) Agreement: The line must have been expressly agreed upon by the interested parties and afterwards acquiesced in.

(3) Estoppel: The party whose rights are to be barred must have silently looked on with knowledge of the true line while the other party encroached thereon or subjected himself to expense which he would not have incurred had the line been in dispute. *Moore v. Henricksen,* 282 Minn. 509, 165 N.W.2d 209 (1968); *Amato v. Haraden,* 280 Minn. 399, 159 N.W.2d 907 (1968).

■ Because the effect of a practical location is to divest one party of property that is clearly and concededly his by deed, the evidence establishing the practical location must be clear, positive, and unequivocal. *Beardsley v. Crane,* 52 Minn. 537, 54

7. Plaintiffs' amended complaint contains a theory of recovery based on the law of close corporations as does plaintiffs' appeal brief. The trial court's findings, conclusions, and memorandum appear to ignore that theory of recovery. Defendant claims it is a new theory improperly raised for the first time on appeal. While some preliminary questions concerning

Phillips' actions with Lilac Lanes and Enterprises were asked at trial, there is an absence of evidence in the record to suggest that plaintiffs were proceeding on any theory of corporate duty. Further, plaintiffs have not cited any case law supporting a theory of practical location based upon failure to perform corporate duties.

N.W. 740 (1893); *Roy v. Dannehr,* 124 Minn. 233, 144 N.W. 758 (1914); *Dunkel v. Roth,* 211 Minn. 194, 300 N.W. 610 (1941); *Moore v. Henricksen, supra.* The trial court found that there had been no location, other than the 434-foot line, which the actions of the parties had established as the boundary. That finding is not clearly erroneous. The record discloses that plaintiffs presented unclear and contradictory evidence of where they believed the boundary should be placed. There can hardly be an acquiescence in a boundary line that is claimed to be located in several different places. Further, there was no real claim of an express agreement to a boundary line other than the 434-foot line.

The trial court's finding of no practical location by estoppel is supported by the fact that estoppel requires knowing silence on the part of the party to be charged and unknowing detriment by the other. *Benz v. City of St. Paul,* 89 Minn. 31, 93 N.W. 1038 (1903); 5 Thompson, Real Property (1957 Replacement) § 2524, p. 460. From 1941 through 1958 Phillips was the principal interest behind the ownership of both parcels. He could hardly have unknowingly suffered detriment as Lilac Lanes Enterprises and knowingly stood silent as Lilac Way Shopping Center. After defendant became the principal interest behind the shopping center, she did not stand silent. The trial court's finding is also supported by the fact that plaintiffs' occasional paving, snow-plowing, and other work on the shopping center parking lot was not an unknowing detriment. They willingly paid for improvements on what they knew was not their property because they knew their customers were parking there. Further, plaintiffs' assertions of detriment based on an alleged need for parking in front of the restaurant is unconvincing because of the ample parking available elsewhere.

3. In her counterclaim, defendant originally requested a permanent injunction prohibiting plaintiffs from permitting motor vehicles to trespass on her property, or to interfere with her easement, and requiring plaintiffs to permanently employ a parking attendant to stop such trespassing and interference. On February 2, 1973, the district court temporarily enjoined plaintiffs and their employees from parking motor vehicles owned or operated by them, or owned and operated by the patrons of the Kings Inn, upon defendant's parking lot south of the 434-foot boundary line.

The trial court found that the 434-foot line is the true legal boundary between the northern and southern parcels. The trial court further found that while defendant has made claim to all lands south of the 434-foot line and objected to plaintiffs' use thereof, plaintiffs have continued to use a portion of the southern parcel.

The evidence clearly supports the trial court's findings that customers of plaintiffs often park on the southern parcel, that plaintiffs' parking attendant has directed them to do so on a number of occasions, and that numerous complaints directed to plaintiffs by defendant and her tenants have not prompted plaintiffs to stop directing and permitting their customers to park on the shopping center parking lot. Such continuous interference, and its threatened perpetuation, has caused hardship for both defendant and her tenants.

■ The granting of a permanent injunction generally rests within the sound discretion of the trial court. *Standard Oil Co. v. Bertelsen,* 186 Minn. 483, 243 N.W. 701 (1932); Spelling & Lewis, The Law Governing Injunctions, § 16. However, a court has no discretion to deny a permanent injunction where the facts proved at trial require such relief. *Currie v. Silvernale,* 142 Minn. 254, 171 N.W. 782 (1919); Spelling & Lewis, The Law Governing Injunctions, § 16.

■ Permanent injunction is a proper remedy to restrain a continuous and repeatedly threatened trespass. *Colliton v. Oxborough,* 86 Minn. 361, 90 N.W. 793 (1902); 9A Dunnell, Dig. (3 ed.) § 4476. It is clear that:

> "One in the peaceable possession of land may maintain an action to restrain repeated and continuing trespasses by one asserting title in himself. The fact

that there is a bona fide dispute as to the title will not prevent the court from passing upon it and awarding equitable relief." 9A Dunnell, Dig. (3 ed.) § 4476, p. 279.

See, also, *Baldwin v. Fisher*, 110 Minn. 186, 124 N.W. 1094 (1910). We hold that on the basis of the facts established at trial defendant is, as a matter of law, entitled to permanent injunctive relief against future trespasses upon her property by plaintiffs and their employees. The sole alternative threatens a multiplicity of future litigation involving claims for damages not readily capable of valuation. On the basis of the record, defendant is entitled to an injunction making permanent the temporary relief which was afforded her pending the outcome of the trial on the merits. Accordingly, the judgment is affirmed to the extent that it held plaintiffs not entitled to reformation of the August 4, 1941, deed and to the extent it held plaintiffs not entitled to a relocation of the boundary line under Minn.St. 559.23. However, this matter is remanded with instructions that the trial court award defendant permanent injunctive relief prohibiting plaintiffs and their officers, agents, and employees (a) from parking their own motor vehicles upon defendant's parking lot, and (b) from parking or directing the parking of motor vehicles owned or operated by the patrons of Kings Inn upon defendant's parking lot. Defendant's parking lot shall include all of that area south of a line 434-feet long as described in the 1941 deed and survey.

Affirmed in part, reversed in part, and remanded with instructions.