Eric J. SLINDEE, et al., Appellants,

v.

FRITCH INVESTMENTS, LLC; and also all unknown persons claiming any right, title, estate, interest, or lien in the real estate described in the complaint herein, defendant and third party plaintiff, Respondent,

v.

Landecker & Associates, Inc., third party defendant, Respondent.

No. A08–303.

Court of Appeals of Minnesota.

Feb. 17, 2009.

Mark E. Greene, Sarah L. Krans, Bernick, Lifson, Greenstein, Greene & Liszt, P.A., Minneapolis, MN, for appellants.

Stephen F. Rufer, Pemberton, Sorlie, Rufer & Kershner, P.L.L.P., Fergus Falls, MN, and Thomas A. Gedde, Battle Lake, MN, for respondent Fritch Investments, LLC.

Eric R. Heiberg, John A. Markert, Coleman Hull & Van Vliet, Minneapolis, MN, for respondent Landecker & Associates, Inc.

Considered and decided by CONNOLLY, Presiding Judge; ROSS, Judge; and BJORKMAN, Judge.

## OPINION

ROSS, Judge.

This case involves a boundary dispute between adjacent Cass County landowners, Eric and Jerilyn Slindee and Fritch Investments, LLC. This appeal requires us to decide whether the district court correctly designated a boundary by practical location through express agreement based on a mow line on the Slindee property when neither the owners nor their predecessors in interest actually discussed the location of the boundary. We must also decide whether the district court erred when it awarded the Slindees a prescriptive easement, refused to determine trespass damages, and failed to dismiss Fritch's reformation-by-deed claim. Because we hold that a disseizor's tacit understanding and assumptions about the boundary cannot support a finding of a boundary by practical location through express agreement, we reverse the district court's relocation of the disputed boundary. We therefore also reverse its prescriptive easement and trespass decisions. We remand the case to the district court to complete the Slindees' quiet title action, to determine whether to award trespass damages, and to address the Slindees' motion to dismiss Fritch's reformation-by-deed claim.

## FACTS

This boundary dispute begins with relocation of a different boundary 40 years ago. The three relevant parcels as cur-

rently divided are each bordered by Mule Lake on the south and extend to Highway 84 on the north. The difficulty began before 1969, when Walter and Eva Bryant owned a parcel that abutted Gilbert and Florence Norman's parcel. The Bryants owned the parcel originally described as government lot eight, and the Normans owned the parcel to the immediate west described as government lot seven, both demarked on the original recorded plat. Based on the plat, a straight north-south line between government lots seven and eight separated the Bryants' and the Normans' parcels.

In 1969, the Bryants and the Normans entered into an agreement that relocated that boundary westward. The 1969 agreement left the Bryants with a western boundary that was 98 feet further west along the shore than the boundary as depicted on the plat. In other words, the agreement gave the Bryants 98 feet of additional shoreline. They recorded the agreement at the county recorder's office but failed to exchange a quit claim deed to perfect a conveyance.

Walter Bryant divided his lot in 1971 and conveyed its western portion to his son, Ted. Walter Bryant kept the remaining parcel until 1978 when he sold it to Ronald and Ingrid Zimmerman, who operated a resort on it. The record does not contain the deed from Bryant to the Zimmermans. Essential to our discussion, each time the western portion of the original Bryant property was conveyed in three successive sales (from Ted Bryant to Robert Orth, then to Dean de Neui and Donna Hicok, and finally to Eric and Jerilyn Slindee), the abstract described the conveyed parcel with a western border of "the West boundary line of said Lot 8," and the eastern border as lying 200 feet east of that specific line and running north and south, parallel to it.

During Ted Bryant's ownership, his family frequently used a path through the woods on the parcel's eastern side to reach the lake. This path extended toward the parcel's eastern border but remained entirely on Ted Bryant's parcel if its eastern boundary is 200 feet east of the boundary that had divided government lots seven and eight, as described in the abstract. The Zimmermans, who owned the parcel to the east, knew that the Bryants used the path.

Ted Bryant sold his parcel in 1980 to Robert Orth, who used the same path. Robert Orth also maintained a mowed lawn around the parcel's only residence. The lawn and residence occupied less than half of the parcel. The mow line east of the house was irregular. It extended south to a bluff and southeast to the path and the wooded area, curving with the topography. The northern end of that mow line bent to the northwest.

Robert Orth sold his parcel to Donna Hicok and Dean de Neui in 1993. Hicok and de Neui knew of the 1969 boundary agreement establishing the parcel's western boundary, and they built a fence on that boundary. They mowed the same area and kept the same eastern mow line that Robert Orth had maintained. They infrequently used the path from their lawn to the lake.

The Slindees bought the parcel from Hicok and de Neui in 2000 after the Slindees inspected it three times. Like the prior warranty deeds, their warranty deed's abstract described the parcel as "[t]he [w]esterly 200 feet" of government lot eight with no mention of the 1969 boundary agreement that extended the parcel's western boundary 98 feet west of the platted boundary between government lots seven and eight, into government lot seven.

The eastern portion of the lot that Walter Bryant had divided in 1971 remained in the Zimmermans' hands throughout all conveyances of the western portion. But the Zimmermans sought to sell their parcel in 2002, and Chris Fritch of Fritch Investments was interested. Fritch toured the parcel. He noticed the lawn-to-lake path through the woods that had been used by the Bryants, Orths, and, to a limited degree, Hicok and de Neui. Fritch submitted a purchase agreement contingent on a survey. But he removed the contingency before closing despite being aware of the path, which was on the Slindees' property only if the eastern boundary was measured as being 200 feet east of the platted boundary between government lots seven and eight. After the closing, Landecker and Associates conducted a survey, but it determined the Slindees' eastern boundary by measuring eastward 200 feet from the boundary as relocated in 1969 rather than from the platted line dividing government lots seven and eight. As a result, Fritch was told that he had purchased 640 feet of shoreline.

The shoreline length was important to Fritch because he intended to develop and subdivide the property, and the county imposed a 150–foot minimum width requirement for each lot. The county rejected Fritch's plat submission because the submission relied on the 1969 boundary agreement, not the platted government lot line, as the point from which to begin measuring eastward to mark the eastern boundary of the Slindee parcel. Fritch asked the Slindees to provide a quit claim deed to the disputed area, but they refused. Fritch would have to reduce the number of lots in his development plan unless he could include the disputed land along the Slindee–Fritch boundary. So despite knowing of the Slindees' competing claim to the land along the Slindee–Fritch boundary, Fritch removed small trees and shrubs from the area.

The Slindees sued Fritch to quiet title and to obtain trespass damages, along with treble damages for the destroyed trees. Fritch brought a counterclaim seeking a judgment to reform the deed to the Slindee lot. The parties tried the case in the district court, which concluded that Fritch owned the disputed area based on boundary by practical location through express agreement and denied the Slindees any trespass damages. The district court sua sponte awarded the Slindees a prescriptive easement to continue to use the path from their lawn to the lake. The district court did not decide Fritch's claim for reformation by deed because it deemed the boundary-by-practical-location decision to be dispositive. The Slindees appeal.

### ISSUES

I. Did the district court properly designate a boundary by practical location through express agreement based on tacit acceptance of a mow line by the parties' predecessors in interest?

II. Did the district court err by failing to dismiss Fritch's reformation-of-deed claim when the originally conveying parties to the deed were not joined?

III. Did the district court properly deny the Slindees damages for trespass?

IV. Did the district court properly award the Slindees a prescriptive easement to use the path from their lawn to the lake?

### ANALYSIS

#### I

■ The Slindees challenge the district court's designation of a boundary by practical location through express agreement. They argue that neither they nor the predecessors in interest to the two parcels reached an express agreement to establish

the mow line as the boundary line and that the mow line is too irregular and imprecise to constitute a boundary. The challenge is well founded.

■■ Boundary by practical location, like adverse possession, transfers title between deed holders. *Gabler v. Fedoruk,* 756 N.W.2d 725, 728–29 (Minn.App.2008). Because a boundary determination involves a fact issue, we give the district court's determination "the same deference" that we extend to other factual determinations, reviewing the boundary determination for clear error. *Wojahn v. Johnson,* 297 N.W.2d 298, 303 (Minn.1980); *see* Minn. R. Civ. P. 52.01 (stating that district court's findings of facts will not be set aside unless they are clearly erroneous and that its findings should receive due regard because district court could evaluate witnesses' credibility). Determining whether these factual determinations support the district court's legal conclusion is a question of law, which we review de novo. *Gabler,* 756 N.W.2d at 730.

■■ A party can establish a boundary by practical location in three ways: (1) by acquiescing in the boundary for a sufficient period of time to bar a right of entry under the statute of limitations; (2) by expressly agreeing with the other party on the boundary and then by acquiescing to that agreement; or (3) by estoppel. *Theros v. Phillips,* 256 N.W.2d 852, 858 (Minn. 1977). The party considered the disseizor of the land must present evidence that establishes the boundary's practical location clearly, positively, and unequivocally. *Id.* If the disseizor cannot prove a boundary by practical location, the actual boundary as established by the original survey and plat controls. *Benz v. City of St. Paul,* 89 Minn. 31, 36, 93 N.W. 1038, 1039 (1903). To establish a boundary by practical location through express agreement, Fritch had the burden to prove that an express agreement between the landown-ers set an "exact, precise line" between his parcel and the Slindees' parcel and that the agreement had been acquiesced to "for a considerable time." *Beardsley v. Crane,* 52 Minn. 537, 546, 54 N.W. 740, 742 (1893).

Despite each party's similar *ad hominem* charge that the other is a greedy land grabber, it is evident to us that neither Fritch nor the Slindees sit in a compellingly sympathetic equitable position. If the Slindees' eastern boundary is established by measuring 200 feet east from the lot seven-eight platted boundary, the *Slindee lot* will include shoreline approximately 100 feet longer than the 200–foot lot contemplated in their purchase. If, on the other hand, the Slindees' eastern boundary is established by measuring 200 feet east from the western boundary established in the 1969 boundary agreement, the *Fritch lot* will include shoreline approximately 100 feet longer than the shoreline contemplated under the existing plat; Fritch could have considered this fact before purchase when he noticed the path from the Slindees' lawn to the lake. The prevailing party—whomever it is—will receive a windfall of property extending beyond what arguably should have been understood under the circumstances at purchase. Equity tips in neither direction.

The district court found that the boundary between the Slindee and Fritch parcels was "virtually undisputed"; that the Slindees' eastern mow line, the Slindees' building locations, and the fence on the Slindees' western boundary allow a clear finding of the eastern boundary; and that the Zimmermans "expressly agreed [with de Neui and Hicok that the mow line] was the boundary prior to Slindees' purchase of the property." Construed most favorably to the outcome, the evidence does not support these findings.

We note initially that the mow line on the Slindee parcel along the eastern side of

the residence does not appear on its face to have intended to follow any straight boundary. It is a meandering, curvy line that does not resemble the boundary as described by any of the transactional documents or as depicted in the recorded plat. The line by itself suggests little, so we turn to consider its relationship to the structures built on the Slindee property and then to testimony about its relationship to an alleged agreement.

The location of the building structures also adds nothing to determining the Slindees' eastern boundary. Without question, the structures on the Slindee parcel disregard the platted boundary between government lots seven and eight. Part of the Slindees' residence and their entire garage and septic system sit west of that original boundary. And a fence along the Slindees' western boundary begins at the lake 98 feet west of the platted boundary between government lots seven and eight, and extends northward. But these structures bear no relation to the eastern mow line and do not resolve the present boundary dispute. Their construction is consistent with the 1969 express agreement between the Slindees' predecessor in interest and their western neighbor regarding the Slindees' *western* boundary. They do not resolve the issue in this case, which is whether an express agreement relocated the lot's *eastern* boundary.

There is no support in the trial testimony for the district court's finding of an express boundary-location agreement made by Fritch's predecessors in interest (the Zimmermans) with the Slindees' predecessors (de Neui and Hicok). Fritch's brief quotes substantial portions of ambiguous trial testimony purporting to prove an "express agreement" between the parties' predecessors, but it fails to include or discuss this clearly contrary statement by de Neui:

Q. Did you ever have any discussions with [the Zimmermans] regarding the location of your east boundary line?

A. Not really, no.

And although the term "mutual agreements" between these former owners certainly exists in the record, it appears only in a context indicating that Ronald Zimmerman never actually obtained an express agreement from de Neui to relocate the boundary to the de Neui mow line:

Q. And without telling me what they were, did you have some conversations with neighbors over the years about where that west boundary line was located?

A. *I don't recall any conversations,* just mutual agreements.

Q. Did you have some mutual agreements or conversations with Mr. Dean de Neui at times about the location of the boundary line?

A. We both were in agreement that the line was the mow line.

Q. And what do you base that statement on?

A. I don't know how you mean that. How do I base that?

Q. *Well, what leads you to that conclusion that you were in agreement as to that boundary line with Mr. de Neui?*

A. *The fact there was a mowing line and the line was just an accepted piece of line* that identified our property versus his.

(Emphasis added.) In his brief and in response to questions of his counsel at oral argument, Fritch provided no other basis to support the district court's finding of an express agreement by the Zimmermans with their neighbors Hicok and de Neui. The trial testimony of the parties' predecessors in interest does not establish an

*express* agreement between them. Rather, it establishes that they had no discussions or conversations regarding the location of the boundary. It proves only that Fritch's predecessor subjectively believed that "the [mow] line was just an accepted piece of [the boundary] line." There is no evidence that Zimmerman's personal belief about a "piece of" the boundary was ever uttered, let alone the subject of an express agreement with his neighbor to establish the property line. Certainly the district court should carefully consider whether the unilateral belief *of the disseizor* can constitute an express agreement after the titled property owner denies ever discussing the property line with him. And the exhibits make it abundantly clear that the mow line does not track the boundary that would result either from a 200–foot measurement from the western boundary as platted or from a 200–foot measurement from the western boundary as relocated by the 1969 agreement.

The cases of *Nadeau v. Johnson* and *Phillips v. Blowers* are instructive. In *Nadeau,* the adjacent landowners orally agreed on their lots' dividing line, made measurements, placed a marker for future reference, and constructed buildings on their lots according to the line. 125 Minn. 365, 366–67, 147 N.W. 241, 241–42 (1914). The supreme court concluded that the owners "deliberately established and agreed upon the dividing line, and subsequently acquiesced in and acted upon that as the true line" therefore establishing a boundary by practical location through express agreement. *Id.* at 367, 147 N.W. at 242.

In *Phillips,* a dispute developed between two landowners when one built a fence ostensibly on the shared boundary. 281 Minn. 267, 270, 161 N.W.2d 524, 527 (1968). These landowners' respective predecessors in interest had reached an express agreement regarding a mutual corner and they had marked it with an iron pipe. *Id.* But

the successors reached only a general agreement regarding the boundary extending from the marker. *Id.* at 271, 161 N.W.2d at 527. The supreme court noted that the boundary as previously agreed to was unclear and rested within an eight-foot area between two incomplete tree lines. *Id.,* 161 N.W.2d at 528. It also observed that the parties had no other positive act of possession until the fence construction. *Id.* The court held that the evidence was too ambiguous on both the agreement and acquiescence to establish a boundary by practical location through express agreement. *Id.*

Unlike in *Phillips,* where the parties presented evidence of actual conversations attempting to establish a boundary, Zimmerman recalled no "conversations, just mutual agreements" that the boundary line was the mow line. At most, in context, this evidenced de Neui's acquiescence in a boundary that Zimmerman silently assumed to exist. The assumption was based solely on the mow line's presence, not on a specifically placed monument deliberately indicating the boundary, such as *Phillips's* iron pipe or *Nadeau's* marker. The "mutual agreements" as asserted at trial do not rise to the level of the express agreement noted in *Nadeau* or of the first express agreement in *Phillips.* The evidence here more closely resembles the ambiguous evidence of *Phillips's* second alleged agreement, which the supreme court deemed insufficient to establish a boundary by practical location through express agreement.

 We hold that an "express agreement" requires more than unilaterally assumed, unspoken and unwritten "mutual agreements" corroborated by neither word nor act. *See Black's Law Dictionary* 601 (7th ed.1999) (defining "express" as "[c]learly and unmistakably communicated," as well as directly stated); *see also*

*The American Heritage Dictionary* 646 (3d ed.1992) (defining "express" as definitely and explicitly stated, as well as particular and specific). If mere silent understanding and tacit acceptance could support a finding of an express agreement, an additional period of acquiescence to the agreement would be unnecessary. *See Theros,* 256 N.W.2d at 858 (restating requirement of both an express agreement and period of acquiescence). Without a specific discussion identifying the boundary line or a specific boundary-related action clearly proving that the parties or their predecessors in interest had agreed to a specific boundary, a boundary is not established by practical location based on express agreement.

■ Even if there had been some basis to treat the mow line as a marker evidencing an attempted boundary agreement, a title-transferring boundary agreement must also establish an "exact, precise line." *Beardsley,* 52 Minn. at 546, 54 N.W. at 742; *see also The American Heritage Dictionary* 636, 974 (3d ed.1992) (defining "exact" as "not approximate" and "strictly and completely in accord with fact" and defining "precise" as "clearly expressed or delineated; definite"). The evidence does not support the district court's determination that the mow line's existence helped to establish the eastern boundary because the mow line is irregular, imprecise, and inconsistent. Without an exact, precise line, Fritch cannot prove express agreement or acquiescence in that line. *Theros,* 256 N.W.2d at 858–59.

We add that separate practical problems also prevent reliance on the mow line to establish the boundary in this case. The mow line extends for less than one half the length of the parcel's eastern boundary. The surveyor noted that the mow line "kind of quit" because the area to the north "turned into woods and brush" and wetlands. An Orth family member noted that the parcel's southern boundary ended in a bluff and the parcel's eastern boundary became wooded near the path. An incomplete boundary line is too ambiguous to rely on to prove an expressly agreed boundary. *See Phillips,* 281 Minn. at 271, 161 N.W.2d at 528 (refusing to apply boundary by practical location through express agreement when the boundary line was within an eight-foot area of "two incomplete rows of trees" and appeared ambiguous in agreement and possession). The mow line here is similarly too ambiguous to establish the boundary even if the parties had agreed generally to rely on it.

Although Fritch accurately highlights that the multiple abstracts conveying the parcel successively from Ted Bryant and eventually to the Slindees refer to a parcel that is 200 feet wide, the mow line does not measure consistently to mark 200 feet from *any* straight western border. The trial evidence demonstrated that the mow line invaded the disputed area between 10 to 15 feet in some places, and in other places the mow line was 40 feet shy of the disputed area. The mow line does not track the 200–foot width described in the Slindees' deed or the western boundary as assumed in the Landecker survey, undercutting the district court's finding that the mow line "was consistent with the 200 foot wide lot as measured from the west fence line of the Slindee property as memorialized in the [1969] boundary line agreement." The 1969 boundary agreement undisputedly marks the Slindees' western boundary; but, absent an express agreement, the eastern boundary remains as described in the parcel's abstract—200 feet east of and parallel to the platted line between government lots seven and eight.

We conclude that the district court's findings in support of an express agreement to a boundary by practical location are clearly erroneous. Because the find-

ings are erroneous, they cannot support the legal conclusion that a boundary by practical location was established through express agreement.

## II

The Slindees contend that the district court erred by failing to dismiss Fritch's claim to reform the Slindees' deed because Fritch was not a party to the deed and de Neui and Hicok, who were parties to the deed, were not joined as parties in this case. To reform a deed, a claimant must show (1) that a valid agreement existed between the parties that expressed their real intentions, (2) that the written instrument failed to express the parties' real intentions, and (3) that this failure resulted from the parties' mutual mistake, or a unilateral mistake accompanied by the other parties' fraud or inequitable conduct. *Manderfeld v. Krovitz*, 539 N.W.2d 802, 805 (Minn.App.1995), *review denied* (Minn. Jan. 25, 1996). Reforming a deed generally involves "the *original* parties to an instrument and those in privity with the original parties." *Id.*

The district court did not address reformation because its decision on boundary by practical location resolved Fritch's claim to the disputed land. The district court did emphasize that Hicok and de Neui were not parties to the action, appearing to credit the Slindees' argument that Hicok and de Neui were needed to reform the deed. The district court appears to have correctly recognized that Hicok and de Neui were necessary parties to order the reformation of their deed to the Slindees based on *Manderfeld*. But the district court seems to have decided not to reach the reformation issue due to its ultimate determination of the boundary location. We generally do not address issues presented in but not decided by the district court. *Wood v. Diamonds Sports Bar & Grill, Inc.*, 654 N.W.2d 704, 709 (Minn.App.2002). Given our holding re-versing the determination of boundary by practical location, the district court will have the opportunity to address the Slindees' pleading-deficiency challenge to Fritch's reformation claim.

## III

The Slindees also contend that they are entitled to trespass damages. Because Fritch failed to divest the Slindees of title by proving a boundary by practical location through express agreement, he has not successfully prevented the Slindees from obtaining trespass damages for his removal of trees and shrubs from the disputed area. *See Ehle v. Prosser*, 293 Minn. 183, 183, 197 N.W.2d 458, 459 (1972) (stating that divesting record owners of title bars them from remedy). We therefore reverse the district court's determination that the Slindees are barred from obtaining trespass damages, and we remand for further proceedings to address the Slindees' quiet-title and trespass claims.

## IV

Fritch contends that the district court erred by awarding the Slindees a prescriptive easement to use the path from their lawn to the lake. Reversing the district court's boundary decision, we need not address this contention. Because Fritch failed to divest the Slindees of title to the disputed area through boundary by practical location, the platted line between government lots seven and eight controls as the baseline to measure to the Slindees' eastern boundary, leaving the Slindees' title to the area intact. *See Benz*, 89 Minn. at 36, 93 N.W. at 1039 (holding that the actual boundary as established by original survey and plat controls if boundary by practical location is not proven). Because fee owners do not need an easement to use their own land, we reverse the district

court's grant of an easement to the Slindees as unnecessary.

## DECISION

We hold that Fritch has not established title to the disputed area through boundary by practical location based on express agreement. We reverse the district court's boundary and easement determinations and remand for the district court to revisit the parties' contentions regarding Fritch's reformation claim and the Slindees' quiet-title and trespass claims.

**Reversed and remanded.**