# HARRY JEDNEAK AND ANOTHER v. MINNEAPOLIS GENERAL ELECTRIC COMPANY.[1]

April 2, 1942.

No. 33,037.

[1]Reported in 4. N. W. (2d) 326.

*Carlson & Carlsen, Edward J. Callahan,* and *Kozlak & Kozlak,*
for appellants.

*Fowler, Youngquist, Furber, Taney & Johnson, C. A. Taney, Jr.,*
*A. William Groth,* and *Cyrus Erickson,* for respondent.

HILTON, JUSTICE.

Action to enjoin and to recover damages for the maintenance
of a nuisance. Defendant, the Minneapolis General Electric Com-
pany, is a public utility whose power plant is located adjacent to
the Mississippi River in northeast Minneapolis in an area zoned
by the city for heavy industrial use. Plaintiffs, who since 1923
have lived nearby, claim that cinders unnecessarily escape from
defendant's smokestacks onto plaintiffs' premises, interfering with
their physical enjoyment of life. A similar claim is made as to
dust blown from defendant's coal piles, which for many years have
been situated upon the premises for emergency use, plaintiffs claim-
ing that the coal piles are not properly watered down. After
trial to a jury, which returned a verdict for defendant, plaintiffs
appeal from an order denying their motion for new trial.

The industrial area in which defendant is located is largely and
substantially given over to railroads, repair shops, switch tracks,
elevators, and other heavy industry. In the normal functioning
of these enterprises, particularly the railroads, noise, dust, cinders,
and smoke are incidental conditions. As need for electricity has
increased, defendant has several times enlarged the original facili-
ties with which it began in 1911. Additional boilers and smoke-
stacks have been added. By their evidence, plaintiffs have shown
that when the wind assists, cinders and dust in such quantities
come over upon their premises, on which they combine business and
residence, that life becomes very disagreeable. The windows must
be closed, otherwise the cinders and dust come into the house.
Once inside, the dust and cinders get into everything—food, clothing,
fixtures, and rugs. Ordinary tasks, such as washing of clothes, be-
come very difficult. The parties, of course, disagree over the ex-
tent to which the dust and cinders interfere with the enjoyment

of life, as well as their source and removability. The area in which plaintiffs reside is zoned for light industrial uses.

The defendant's boilers are stoker-fed. The devices which they use for elimination of the cinders produced in the combustion process are said to be in accordance with accepted engineering standards. By changing the direction of the flue gases, by use of chambers and breeching which slow down the rush of gas, by using cinder-collecting fans which engage the cinders in the gas stream, the defendant removes the cinders from the smokestacks and drops them into cinder-collecting hoppers located between the boilers and the top of the stacks. Admittedly, these devices do not remove all cinders. In addition to attacking the manner in which defendant's smokestacks are constructed, plaintiffs claim that the cinder-removing devices sponsored by them are superior to those used by defendant and would remove a greater percentage of cinders, soot, and ashes.

The principal question with which we have been concerned is the propriety of the trial judge's instructions upon the subject of nuisance. They were:

"A nuisance has been defined by our statutes as anything which is injurious to health, or indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property. [Mason St. 1927, § 9580.] If it does so it is a nuisance. Industrial nuisances are usually right things in wrong places, or improperly operated things. Circumstances must always determine whether or not one of these is a nuisance. I dare say that most of you would consider it a nuisance to have a church right next to your home, with automobiles parked all around. Perhaps a schoolhouse the same way, or perhaps an undertaking establishment, but all of these places, as well as those that are more obviously disagreeable to us, must have their place in city life. We are bound to take what hardships or inconveniences or discomforts that come from them if they are properly located in a location allocated to them, and if they are properly operated. If they are not so located, or if they are not

so operated then one who is damaged by such improper location or such improper operation is entitled to recover for whatever damage may be sustained."

Thereafter, the trial judge went exhaustively into claims of the parties with regard to their respective devices and the operations of each.

The plaintiffs strenuously object to this instruction as being destructive of the scope of the statute and contrary to the decision law of this state, relying chiefly upon Brede v. Minnesota Crushed Stone Co. 143 Minn. 374, 173 N. W. 805, 6 A. L. R. 1092. They say that a nuisance may exist irrespective of the fact that it is properly located or properly operated and that negligence or carelessness need not be proved to establish a nuisance.

Under certain circumstances a nuisance may exist although the conditions complained of are naturally attendant to that activity. Lead v. Inch, 116 Minn. 467, 134 N. W. 218, Ann. Cas. 1913D, 891, 39 L.R.A.(N.S.) 234; Stuhl v. G. N. Ry. Co. 136 Minn. 158, 161 N. W. 501, L. R. A. 1917D, 317. As explained in Brede v. Minnesota Crushed Stone Co. *supra,* the rule is that the residents living in the vicinity of the objectionable activity are to be protected against a material and substantial interference with their ordinary physical comfort. However, not only is the degree of discomfort measured by "the standards of ordinary people" and "not by the standards of persons of delicate sensibility" (*Id.* p. 379), but even more important, the residents are entitled only to have the substantial and material phase of the interference removed so that they "will suffer discomforts no greater than those ordinarily incident to life in many sections of every city." *Id.* p. 382. See Roukovina v. Island Farm Creamery Co. 160 Minn. 335, 339, 200 N. W. 350, 38 A. L. R. 1502. Thus in that case, while it was found that the incidents of the operation of a stone quarry in a residential area substantially interfered with the residents' enjoyment of life, this court would not assume that the inconvenience could not be mitigated to the point where plaintiffs would be obliged to stand it. Though located in the only place where it

could be, we could not believe that the quarry was being operated as carefully as possible so as to reduce the interference to the level of tolerable inconvenience. Village of Wadena v. Folkestad, 194 Minn. 146, 260 N. W. 221.

And so it must be, particularly in an area zoned for industrial use. The mere existence of any industry is attended by inconvenience. Since industry is essential to our modern life, cities, in an effort to minimize the number of people affected by such inconvenience, prescribe certain areas for the location of industry. As to those residing in that area, the interference by industry with their physical enjoyment of life cannot be eliminated. Residents there cannot expect the same relative freedom from smoke, dust, cinders, and noise generally enjoyed by those living in residential areas. *Cf.* Romer v. St. Paul City Ry. Co. 75 Minn. 211, 77 N. W. 825, 74 A. S. R. 455. What would be a substantial interference with the enjoyment of life in a residential area might very well be perfectly normal and inescapable in an industrial section. The problem becomes one of measuring what is normal and what is abnormal interference with life in an industrial area.

It may be conceded that the mere fact that an industry is located in an industrial district does not in itself justify its maintenance as a nuisance. See Eaton v. Klimm, 217 Cal. 362, 18 P. (2d) 678. Its manner of operation may be such as substantially to interfere with the comforts of life of those resident there. Or if properly operated, it may be accompanied by such offensive conditions that its presence even in an industrial area cannot be tolerated. But where, as here, the activity involved is not of that type and where it is not contended that the activity should be removed to another location, *cf.* Northwest Home Owners Assn. Inc. v. City of Detroit, 298 Mich. 622, 299 N. W. 740, ordinarily the fact that an industry is being operated under methods best calculated to remove the conditions causing the inconvenience is convincing indication that whatever annoyance is being suffered by those living there is only such as is inescapably present in that area. Though negligence upon part of defendant need not be

proved, whether defendant was doing as much as reasonably was possible in the way of careful operation becomes the measure of whether there has been substantial interference with plaintiffs' enjoyment of life.

In this posture of the case, plaintiffs have no ground on which to complain of the trial court's instructions upon the subject of nuisance. The superiority of rights of habitation over rights of trade as stated in the Brede case, 143 Minn. 374, 173 N. W. 805, is applicable to industrial areas only to the extent above indicated. Obviously, the trial court was not classifying defendant's plant along with churches, schools, and undertaking establishments as tolerable inconveniences. The court was there referring to the lay understanding of "nuisance" as embracing any inconvenience, however slight, in order to distinguish it from the legal concept of nuisance. As used in the instruction, "proper operation" meant that defendant had used all precautions reasonably available to restrict the degree to which surrounding residents were inconvenienced. By "improper operation" was meant that defendant had not, as contended by plaintiffs, incorporated into the plant methods of established superiority. By its verdict the jury has found that defendant's plant was properly and carefully operated. In light of what has here been said, that finding, supported as it is by more than adequate evidence, determined the nonexistence of any nuisance.

Upon the question of whether there are devices in common use which are more efficient in removing the objectionable material from smokestacks, the evidence and implications ran in different directions, and that was properly resolved by the triers of fact. Certainly the cost of a change, the probability of betterment, and the effect upon performance were all factors which any industry should consider in determining whether to experiment with devices other than those now in use. Where an industry has done nothing to minimize or inhibit the existence of objectionable materials produced as an incident of its operation, there is good reason to compel the adoption of existing appliances designed for that purpose.

Heller v. American Range Corp. 182 Minn. 286, 234 N. W. 316. But this is not so where an industry after intelligent judgment concludes that its present devices are superior to, or at least the equal of, those used by others. Certainly the evidence here falls far short of compelling the conclusion that the devices sponsored by plaintiffs were of marked superiority. Indeed, it is doubtful whether a finding in their favor could have been sustained. Claimed error in the statement of the claim of the respective parties was corrected by the court before the case was submitted to the jury.

Plaintiffs' reliance upon State v. Randall, 143 Minn. 203, 173 N. W. 425, as an authority opposed to the trial court's limitation of plaintiffs' witnesses, is misplaced. There the sole thing in controversy was whether in a speech defendant had made statements discouraging enlistment in the armed forces. The only way he could be given an opportunity to disprove this charge was by production of the witnesses from the audience. Since the versions of what defendant said were likely to vary, in order to protect defendant from the effect of unrepresentative testimony, it was necessary to hold that the limitation of witnesses upon this, the main issue, was improper. Here, the broad issue was whether the conditions created by the operations of defendant's plant constituted a nuisance. The trial court allowed plaintiffs 12 witnesses besides the six members of the Jedneak family. The testimony of those witnesses who were not permitted to testify merely went to the conditions (smoke, dust, cinders, etc.) prevailing generally. These conditions were adequately established by those who were permitted to testify, and the rejected testimony had merely a cumulative effect. Furthermore, as previously indicated, the real question was whether these conditions represented substantial or merely normal interference with plaintiffs' enjoyment of life.

Other assignments of error raise questions having no merit. Permitting the jury to view the premises was certainly a permissible exercise of discretion, and charges of misconduct are without substance. Failure to admit into evidence an ordinance

of the city of Minneapolis making it unlawful to permit the escape of certain noxious substances and odors was not erroneous. Aside from the serious question of its application in this case, it being a criminal ordinance, the court, by virtue of the manner in which it was pleaded, knew of its existence by judicial notice. Mason St. 1927, § 9270. No proper foundation was made for the admission of exhibit "KK," a bottle containing materials said to have been removed from a plant using competitive devices, to establish the superiority of such system. Its probative value was too speculative to be relevant unless the identity of operating conditions between the two plants was established in considerable detail.

Order affirmed.