**CITIZENS FOR A SAFE GRANT, et al., Respondents,**

v.

**LONE OAK SPORTSMEN'S CLUB, INC., Appellant,**

**Merrill H. Oestreich, et al., Defendants.**

**No. C9-00-1247.**

Court of Appeals of Minnesota.

April 17, 2001.

---

Marc J. Manderscheid, Lisa M. Agrimonti, St. Paul, MN, for respondents.

Alan T. Tschida, Shoreview, MN, for appellant.

Considered and decided by LANSING, Presiding Judge, ANDERSON, Judge, and HALBROOKS, Judge.

## OPINION

HALBROOKS, Judge.

On appeal, Lone Oak Sportsmen's Club, Inc. alleges that (1) the trial court should not have enjoined certain uses of the club because respondents failed to show damages, nuisance or trespass, or a violation of the Minnesota Environmental Rights Act (MERA); (2) the claims for nuisance, trespass, and MERA violations are barred by the statute of limitations or on the grounds that appellant established a prescriptive easement; (3) the trial court abused its discretion by excluding expert testimony; and (4) the trial court's findings regarding the danger posed by appellant is unsupported by the record. Because we conclude that the statute of limitations does not bar respondents' claims, appellant cannot establish a prescriptive easement, and the record supports the trial court's findings, we affirm.

## FACTS

Appellant Lone Oak Sportsmen's Club, Inc., is a private club and an affiliate of the National Rifle Association (NRA). In March 1951, appellant incorporated as a non-profit organization and later purchased an 11–acre tract to operate four shooting ranges (13 acres total). The property is currently zoned A–2 (agricultural and residential). It is surrounded on all sides by privately owned residential property. A protected wetland is located

off the northwest corner of the club property. The club is open to members for shooting from 9:00 a.m. to sunset or 8:00 p.m. every day of the year. A range officer is on duty only during club-sponsored events. Appellant erected a gate to block roadway access. Members have keys to the gate and to an equipment facility, but the perimeter of the grounds is not fenced.

Respondent Citizens for a Safe Grant is a non-profit corporation consisting of several families who live adjacent to or in the vicinity of the shooting ranges. Throughout the 1960s, the Burlington Northern Railroad Co. operated trains over tracks that ran along appellant's northern boundary. The tracks were removed and the right-of-way was sold to abutting property owners in March 1984. The old roadbed is now used as a path for hiking, jogging, and biking.

On April 2, 1985, the Grant Town Board (Grant) adopted Ordinance 57, an ordinance regulating the use of firearms and weapons in the Town of Grant. The ordinance provides in part as follows:

Section 2. Illegal Use of Firearms.

a. Except as hereinafter provided, no person shall discharge upon, over, or onto the land of another a firearm of any kind, * * * or other devices for the propulsion of shots or metal pellets by means of compressed air, gas, or mechanical spring action, within the limits of the Town of Grant, without the express written and dated permission of the owner or lessee of such property to discharge such firearms, weapon, or other device thereon.

b. Except at target ranges as defined in Section 3 hereunder, no person shall discharge at any time whatsoever, a rifle, pistol, or revolver of a caliber greater than a .22 long rifle.

Section 3. Public and Private Target Ranges.

a. A private target range shall be defined as an area for the discharge of weapons for sport which area and the use thereof is controlled by a club or association and, except for specific events, use is limited to members of the group or association.

b. The Board of Supervisors is hereby authorized to issue conditional use permits for the operation and maintenance of * * * private * * * target ranges in accordance with ordinances of the Town of Grant and other applicable law * * *. Provided, however, that no conditional use permit may be issued until after the Board of Supervisors has visited the site and determined that such use will not constitute a hazard to the health, safety, or general welfare of the public or be or create a public nuisance * * *.

c. The Board of Supervisors may prescribe rules and regulations from time to time, for the construction and operation of said target ranges, including proof of public liability insurance and may cancel or refuse to renew said permit for violation of such rules and regulations.

Ordinance 57 specifically incorporated the NRA's guidelines for shotgun ranges, outdoor pistol ranges, outdoor high-power rifle ranges, and outdoor small-bore rifle ranges. The ordinance changed the permit requirement for a gun club from a special-use permit to a conditional-use permit. Appellant has never applied for a conditional-use permit, but did pay an annual $50 fee for a special-use permit from 1993–98.

On May 24, 1988, respondent Patrick Barrett wrote a letter to Grant complaining about automatic firearms being discharged at the shooting range. Other residents orally complained. Barrett stated that he had experienced bullets whizzing over his head and shotgun pellets on his property. On June 22, 1988, Grant wrote to appellant and warned that its gun-range permit would be revoked if there were

further complaints. Appellant subsequently amended its rules to prohibit the use of automatic weapons.

Respondents continued to complain to Grant about finding bullets on their property and excessive noise from the firing range at all hours. Respondents also noted that either appellant was not controlling its members or keeping its property secure because someone was firing weapons after appellant's posted hours of operation. Respondents asserted that Grant officials failed to enforce local permitting ordinances and allowed appellant to operate without renewing its conditional-use permit.

On March 3, 1999, respondents filed a declaratory-judgment action against Grant and appellant, alleging that appellant had trespassed on their properties, created a nuisance, and violated the Minnesota Environmental Rights Act (MERA), Minn.Stat. ch. 116B (2000). The matter was tried to the court over a six-day period. The trial included a visit to the shooting range so that the court and attorneys could view the property firsthand.

The trial court's findings of fact, conclusions of law, and order includes 121 findings of fact. On these factual findings, the court concluded that appellant had created a nuisance, trespassed on respondents' properties, and violated the MERA. The court noted that, although appellant is an NRA affiliate, appellant has failed to follow many of the NRA's safety recommendations and guidelines. Because appellant's property is now surrounded by residential property and wetlands, the court noted that it would be impossible for appellant to make the club safe, consistent with NRA standards. The court additionally noted that appellant had failed to keep its members from violating club rules and had not provided any specific proposals on how to make the range safer. It, therefore, permanently enjoined appellant from continuing the shooting range but retained the right to lift the injunction if appellant submitted within one year a detailed proposal outlining how to make the shooting range safer. Appellant did not make a motion for new trial, but now challenges the trial court's determinations of trespass, nuisance, and MERA violation and the grant of a permanent injunction.

## ISSUES

I. Did the trial court err in determining respondents' claims were not barred by the statute of limitations?

II. Is there sufficient evidence to uphold the finding that appellant committed a trespass and created a nuisance?

III. Is there sufficient evidence to uphold the finding that appellant violated MERA by endangering wildlife and destroying the natural quietude?

IV. Did the trial court abuse its discretion by permanently enjoining appellant?

V. Did the trial court abuse its discretion by refusing to qualify an expert and to admit scientific tests?

## ANALYSIS

 On appeal from a judgment where there has been no motion for new trial, the only questions we review are whether the evidence sustains the findings of fact and whether the findings of fact support the conclusions of law and the judgment. *Erickson v. Erickson,* 434 N.W.2d 284, 286 (Minn.App.1989). We review the trial court's determination of questions of law de novo. *Rice Lake Contracting Corp. v. Rust Env't & Infrastructure, Inc.,* 549 N.W.2d 96, 98–99 (Minn. App.1996), *review denied* (Minn. Aug. 20, 1996).

### I.

 We first consider whether the trial court erred when it held that the statute of limitations does not bar any of

respondents' claims. A statutory limitation period begins to run when "the cause of action accrues." Minn.Stat. § 541.01 (2000). "A cause of action accrues when all of its elements exist to the extent that the claim could withstand a motion to dismiss." *Bonhiver v. Graff,* 311 Minn. 111, 117, 248 N.W.2d 291, 296 (1976). "The general rule is that ignorance of a cause of action which does not involve * * * trespass * * * does not prevent the running of the statute of limitations." *Toombs v. Daniels,* 361 N.W.2d 801, 809 (Minn.1985).

■ Appellant asserts that the applicable statute of limitations is two years, based on Minn.Stat. § 541.051, subd. 1 (2000), the improvement-to-real-property statute. But this case does not arise out of the "defective and unsafe condition of an improvement to real property * * *." *Id.* The trial court properly determined that the statute of limitations for respondents' claims is six years. Minn.Stat. § 541.05, subds. 1(2) (statutorily-created claims such as nuisance or MERA), 1(3) (2000) (trespass).

■ Further, we conclude that the trial court correctly found that respondents' claims are not barred by the statute of limitations. Although a cause of action generally accrues at the time a suit could theoretically be maintained, courts often delay the beginning of the statutory period "until an event occurs without which a suit would be impossible or improbable." *Fabio v. Bellomo,* 504 N.W.2d 758, 764 (Minn. 1993) (citation omitted). In such circumstances, "[c]ontinuing violations can prevent the expiration of the statute of limitations." *E.g., Kohn v. City of Minneapolis Fire Dep't,* 583 N.W.2d 7, 11 (Minn.App. 1998) (recognizing that "discriminatory acts that persist over a period of time may constitute continuing violations") (citation omitted), *review denied* (Minn. Oct. 20, 1998); *see also State v. O'Hagan,* 474 N.W.2d 613, 621 (Minn.App.1991) (concealing or possessing stolen property is a continuing offense for the purposes of the statute of limitations), *review denied* (Minn. Sept. 25, 1991).

Appellant's conduct in this case is not limited to a single transgression, but must be viewed as an ongoing series of injuries to respondents' properties. *Cf. O'Hagan,* 474 N.W.2d at 622 (finding a property crime continues for as long as the actor possesses the property and intends to exercise control or is exercising control over the property). In the words of the trial court, regardless of

> [w]hether a two-year or a six-year statute of limitations applies, [respondents'] cause of action * * * would not be barred. A new offense arises each time the [shooting range] is used without the provision of safety features or sound abatement.

## II.

■ Appellant argues that there is insufficient evidence to support the trial court's conclusions that appellant created a nuisance and committed a trespass. We give a trial court's findings of fact great deference and will not set them aside unless they are clearly erroneous. Minn. R. Civ. P. 52.01. Our role is not to reconcile conflicting evidence but to review the record to see if there is reasonable evidence to support the trial court's findings of fact. *Fletcher v. St. Paul Pioneer Press,* 589 N.W.2d 96, 101 (Minn.1999).

■ Nuisance is defined as

> [a]nything which is * * * indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property.

Minn.Stat. § 561.01 (2000). For an interference with the enjoyment of life or property to constitute a nuisance, it must be material and substantial. *Jedneak v. Minneapolis Gen. Elec. Co.,* 212 Minn. 226, 231, 4 N.W.2d 326, 329 (1942). A court measures the degree of discomfort by the standards of ordinary people in relation to the area where they reside. *Id.*

Appellant argues that there must be a finding of intent in order to create a nuisance. Appellant's argument is without merit as the statute does not contain an element of intent, and

[t]he general rule * * * is that it is immaterial how innocent the intent was for the element of motive or intent does not enter into the question of nuisance.

*State v. Lloyd A. Fry Roofing Co.,* 310 Minn. 535, 538, 246 N.W.2d 692, 695 (1976) (quotation omitted). The wrongful conduct resulting in creation of a nuisance may be intentional conduct, but can also be "negligence, ultrahazardous activity, violation of a statute or some other tortious activity." *Highview North Apartments v. Ramsey,* 323 N.W.2d 65, 71 (Minn.1982) (citations omitted).

The trial court made the following factual findings, among others, with respect to the impact of the club's operation on respondents' ability to enjoy their properties:

- The Strakas do not allow their grandchildren to play outside and do not leave the vicinity of their house.
- Bob Straka wears an orange vest when outside. He has been showered by shotgun pellets while in his yard and while walking on the old railroad bed.
- The Strakas believe that their appetites and sleep have been affected due to their emotional distress resulting from guns being fired within 430 feet of their house. They are also reluctant to invite guests over for dinner because of the increased shooting between 5:00–8:00 p.m.
- The Franks have experienced bullets or shotgun pellets passing over their heads when they have been walking on the railroad bed.
- The Franks operate a daycare center in their home and do not allow the children onto the second floor of the home due to the proximity of the 200–yard firing line. Use of the yard has been reduced. Mrs. Frank conducts

drills so that the children know what to do when firing starts.

- When shooting starts on the rifle range, the Franks go indoors and shut the windows or go shopping in order to escape the noise.
- The Barretts do not use the eastern ⅛ of their 17–acre property due to fear of errant projectiles and stay close to their home when shooting occurs.
- The Barretts heard bullets hitting the pine trees around their home when high-powered, automatic weapons were allowed.
- The second-floor windows of the Taglia home rattle when shots are fired.
- The Taglias do not use their deck and generally stay indoors because of the noise from the shotgun range.
- The Taglias have seen signs of indiscriminate shooting on the club property so they avoid using trails that they cut in the northeast corner of their property.

The record abundantly supports the trial court's conclusion that appellant has created a nuisance.

As a corollary, appellant argues that it has gained the right to maintain a nuisance through prescriptive easement. In support of its position, appellant asserts that its use of its neighbors' properties has been hostile, actual, open, continuous, and exclusive for at least 15 years. The trial court held that the right to maintain a nuisance can never be acquired by prescription. While that holding is erroneous, we reach the same result as the trial court on the ground that appellant has no support in the record to establish exclusive use of the respondents' property. Further, this theory now advanced by appellant is directly contradictory to appellant's theory of the case that no bullets ever left the range.

Second, appellant contends that the trial court erred in finding that appellant committed a trespass.

Trespass encompasses any unlawful interference with one's person, property, or rights, and requires only two essential elements: a rightful possession in the plaintiff and unlawful entry upon such possession by the defendant.

*Special Force Ministries v. WCCO Television,* 584 N.W.2d 789, 792–93 (Minn.App. 1998) (citations omitted), *review denied* (Minn. Dec. 15, 1998). Trespass is not limited to human entry and can include "throwing or placing an object upon the property of another." *Victor v. Sell,* 301 Minn. 309, 313, 222 N.W.2d 337, 340 (1974) (citations omitted). Since 1988, respondents have repeatedly complained to Grant about finding bullets on their properties and hearing them fly overhead. The trial court found that shotgun pellets varying in size from # 4 to # 9 shot were collected from the Straka property on November 23, 1999. It is undisputed that respondents never gave appellant permission to permit gun shots onto and over their properties. We, therefore, agree with the trial court that

> [t]he entry of bullets over and onto adjacent private property resulting from the operation of the rifle ranges at the Gun Club without the permission of the property owners constitutes a trespass.

## III.

Appellant also argues that there is insufficient evidence to support the trial court's conclusions that appellant violated MERA by endangering wildlife and creating noise pollution. Minnesota has empowered citizens "to protect air, water, land and other natural resources located within the state from pollution, impairment, or destruction" by creating a private cause of action against polluters. Minn. Stat. § 116B.01 (2000); *see also State by Schaller v. County of Blue Earth,* 563 N.W.2d 260, 264 (Minn.1997). To establish a prima facie case, a potential plaintiff must first identify "the existence of a protectable natural resource." *White v. Minnesota Dep't of Natural Resources,*

567 N.W.2d 724, 737 (Minn.App.1997) (citation omitted). The plaintiff must then show that the defendant's conduct violates an "environmental quality standard, limitation, rule, order, license, stipulation agreement, or permit promulgated or issued by" a state regulatory agency. Minn.Stat. § 116B.04 (2000). But recognizing that there are instances when environmental regulations may not keep up with changing conditions, the statute also provides that a plaintiff may bring a claim if the defendant has caused or is "likely to cause the pollution, impairment, or destruction of the air, water, land or other natural resources." *Id.; see also Minnesota Public Interest Research Group v. White Bear Rod & Gun Club,* 257 N.W.2d 762, 771 n. 6 (Minn.1977) (holding that the fact that Minnesota Pollution Control Agency (MPCA) had not issued standards on gunfire noise did not bar a MERA claim based on noise pollution).

Because almost every human activity may arguably adversely impact a natural resource, courts have adopted a five-factor test to determine whether the second prong of a prima facie MERA case has been established. *White,* 567 N.W.2d. at 738. The five factors are

(1) The quality and severity of any adverse effects of the proposed action on the natural resources affected;

(2) Whether the natural resources affected are rare, unique, endangered, or have historical significance;

(3) Whether the proposed action will have long-term adverse effects on natural resources, including whether the affected resources are easily replaceable (for example, by replanting trees or restocking fish);

(4) Whether the proposed action will have significant consequential effects on other natural resources (for example, whether wildlife will be lost if its habitat is impaired or destroyed);

(5) Whether the affected natural resources are significantly increasing or

decreasing in number, considering the direct and consequential impact of the proposed action.

*Id.* (citation omitted). The defendant may rebut the prima facie case by submitting evidence to the contrary or by establishing an affirmative defense. *Schaller*, 563 N.W.2d at 264. To establish this defense, the defendant must prove there is "no feasible and prudent alternative and the conduct at issue is consistent with and reasonably required for promotion of the public health, safety, and welfare." Minn. Stat. § 116B.04.

■ The evidence does not support the finding that respondents established a prima facie MERA violation based on the potential harm that lead bullets pose to wildlife. *See* Minn.Stat. § 116B.02, subd. 4 (2000) (including animals within the definition of protectable natural resources). Respondents have offered anecdotal evidence from various MPCA reports that birds may ingest lead bullets, but there is nothing to link those reports to the wildlife here. Moreover, the trial court's findings indicate that "[t]here is no evidence to suggest that lead shot * * * has increased the lead concentrations in the protected wetland or the ground water" and "[n]o soil testing for lead has been conducted on either the Gun Club property or Plaintiffs' property."

■ But the evidence does establish a prima facie MERA violation based on the degradation of quietude caused by "impulsive sound." *See id.* (including "quietude" within the definition of protectable natural resources). In *White Bear Rod & Gun Club*, the supreme court affirmed a district court's finding that MERA barred operation of a skeet-shooting facility that negatively impacted the environment even though MPCA had not issued a standard regulating noise from such activities. 257 N.W.2d at 768–71, 783. Appellant correctly notes that since *White Bear Rod & Gun Club* was decided, the legislature has exempted "skeet, trap or shooting sports clubs" from the ambit of

regulatory authority. Minn.Stat. § 116.07, subd. 2a (2000). Appellant thus argues that because MPCA cannot pass a noise standard for shooting clubs, respondents have no regulation to base their MERA claim on. But the legislature did not exempt shooting sports clubs from MERA claims, only from MPCA's regulatory authority. As long as respondents demonstrate that appellant's conduct "materially adversely affects" the environment, they can establish a prima facie case. Minn. Stat. § 116B.02, subd. 5 (2000) (defining what types of conduct may be considered pollution). As in *White Bear Rod & Gun Club*, the trial court found that the noise caused by appellant's sporadic gunfire, which ranged from 70 to nearly 90 decibels at various locations, was twice the normal decibel range of the surrounding area and heard extensive testimony from neighboring residents concerning the effects of the loud, unpredictable noise on their lives. *See White Bear Rod & Gun Club*, 257 N.W.2d at 771 (finding that gunfire in the 65 to 70 decibel range were "far in excess of that considered permissible to avoid health threats and degradation of the environment"). The decibel readings were not disputed by appellant's expert. The court found that high decibel sounds such as sporadic gunfire "can cause * * * unreasonable material acoustical degradation to the environment." *Compare with id.* at 776–77. Therefore, we conclude that appellant did not rebut respondents' prima facie showing of a MERA violation.

## IV.

■ We next consider whether the trial court abused its discretion in granting a permanent injunction. We review a trial court's decision to issue an injunction under an abuse-of-discretion standard. *Theros v. Phillips*, 256 N.W.2d 852, 859 (Minn. 1977). To issue such an equitable remedy, the legal remedy must be inadequate, and the injunction must be necessary to prevent irreparable injury. *Cherne Indus., Inc. v. Grounds & Assoc.*, 278 N.W.2d 81,

92 (Minn.1979). This court will not set aside a district court's findings regarding entitlement to injunctive relief unless they are clearly erroneous. *Upper Midwest Sales Co. v. Ecolab, Inc.,* 577 N.W.2d 236, 240 (Minn.App.1998).

 A permanent injunction is the "proper remedy to restrain a continuous and repeatedly threatened trespass." *Theros,* 256 N.W.2d at 859 (citation omitted). Given the nature of respondents' injury, we believe that appellant's trespass fits within this definition. Moreover, from the trial court's findings, it appears that there may be no way for appellant to alter the shooting range to satisfy respondents' safety concerns. The court noted that, although appellant claims that the shooting range can be made safer, appellant failed to offer any specific proposal on how it would go about improving safety and addressing respondents' concerns.

 The trial court found numerous instances where appellant failed to take safety precautions, including:

- There is no fence or other barrier surrounding the entire range to prevent trespassers.
- Although appellant has "no trespassing" signs along a recreational pathway, there are no signs to warn pedestrians that they are passing by a shooting range.
- Appellant has failed to enforce its own rules. For example, appellant has not enforced its hours of operation, allowing either members or trespassers to fire weapons after posted hours. Appellant has also failed to ensure that members use special mounting devices to hold targets as there is evidence that members have used trees, benches, canisters, and buildings to mount targets.
- Appellant did not meet NRA safety guidelines for shooting ranges in inhabited areas because there is not enough setback between the firing line and respondents' properties. Appel-

lant passed up opportunities to purchase adjacent property to increase the setback and reorient the ranges.

- Appellant raises a flag when firing commences, but this flag is not visible from the perimeter of the property. There are no other warning signals when firing will commence.
- Appellant has not erected sound or safety baffles for sound abatement or to contain bullets from landing off-property.

Appellant argues that, despite the long list of safety infractions, it operates safely because there have been no reported accidents in its 50 years of operation. But the law does not require a death or an injury before unsafe conduct can be considered a nuisance. *See* Minn.Stat. § 561.01. Therefore, the trial court did not abuse its discretion by permanently enjoining appellant.

**V.**

 Finally, appellant argues that the trial court erred in two of its evidentiary rulings. The trial court refused to allow appellant's expert, Charles Niska, to testify as to safety and shooting-range design issues. A trial court's evidentiary ruling on the admissibility of an expert opinion rests within its sound discretion, and we will not reverse such a decision unless it is based on an erroneous view of the law or an abuse of discretion. *Gross v. Victoria Station Farms, Inc.,* 578 N.W.2d 757, 760 (Minn.1998); *Reinhardt v. Colton,* 337 N.W.2d 88, 92 n. 1 (Minn.1983) (noting that the trial court has "considerable discretion in determining the sufficiency of foundation laid for expert opinion") (citations omitted). Even if evidence has probative value, the trial court still has discretion to exclude it. *Benson v. Northern Gopher Enters., Inc.,* 455 N.W.2d 444, 446 (Minn.1990) ("Even if this court would have reached a different conclusion as to the sufficiency of the foundation, the decision of the trial [court] judge will not be

reversed absent clear abuse of discretion." (citation omitted)).

Niska has a bachelor's degree and has done graduate course work in forestry. He began work as the "shooting range coordinator" for the Minnesota Department of Natural Resources in 1999 and, since then, has visited nearly 50 shooting ranges. But he conceded that his position involves coordinating grants, not enforcing safety regulations, because his agency has no enforcement authority over ranges. The only training Niska has received in shooting-range safety and design was one week-long course sponsored by the NRA, and that course did not focus solely on safety issues, but also included public relations, financial, and administrative training. We note that the trial court did allow Niska to testify on other matters, including noise and environmental issues, that were found to be within the scope of his knowledge. On this record, the court did not abuse its discretion in refusing to qualify Niska as an expert on the subjects of shooting-range safety and design issues.

 Second, appellant argues that the trial court erred when it refused to admit reports on lead and noise testing. Absent an erroneous interpretation of the law, the question of whether to admit or exclude evidence is within the trial court's discretion. *Kroning v. State Farm Auto. Ins. Co.*, 567 N.W.2d 42, 45–46 (Minn. 1997). Appellant bears the burden of demonstrating that an improper evidentiary ruling caused prejudicial error. *Uselman v. Uselman*, 464 N.W.2d 130, 138 (Minn.1990). "An evidentiary error is prejudicial if the error might reasonably have changed the result of the trial." *Cloverdale Foods of Minn., Inc. v. Pioneer Snacks*, 580 N.W.2d 46, 51 (Minn.App. 1998) (citations omitted). Appellant did not call the authors of the reports to testify and provide proper foundation. Instead, appellant attempted to admit the reports through other witnesses. The court held that the reports were inadmissible hearsay. We conclude that the trial court's evidentiary rulings were well within its discretion.

## DECISION

The trial court properly determined that appellant had created a nuisance, committed a trespass, and violated MERA by materially affecting the natural quietude. The trial court properly found the statute of limitations did not bar respondents' claims because appellant had committed a continuing violation. The trial court was within its discretion when it did not qualify a witness to testify as an expert and when it ruled that scientific tests were inadmissible. The trial court did not abuse its discretion by granting a permanent injunction.

**Affirmed.**

G. BARRY ANDERSON, Judge (concurring in part and dissenting in part).

I concur with the majority's careful and complete analysis of the statute of limitations and trespass claims.

As respondent accurately put it, with respect to the trespass issue, there is nothing in the record to indicate that surrounding property owners consented to the deposit of ammunition on their property. To say that the stray ammunition creates safety concerns is an understatement.

I also concur in the analysis of the majority opinion rejecting the district court finding that respondents established a prima facie MERA violation based on the potential harm that lead bullets pose to wildlife. There is not a shred of evidence in the record supporting any injury to wildlife and, as the majority opinion correctly notes, no soil testing for lead was done to determine lead concentrations.

I also concur that the findings of fact adopted by the district court establish that live ammunition continues to escape the gun club property, which forms the basis of the trespass claim, and which also supports a common-law nuisance claim.

But where I part company from the majority is the conclusion that respondents established a prima facie MERA violation based on the degradation of quietude caused by "impulsive sound" and that the noise levels are sufficient to establish a nuisance claim.

The district court's conclusion that a MERA violation occurred as a result of noise levels was broad, sweeping, and could be applied to virtually every outdoor gun range. In fact, the analysis of the district court, affirmed in the majority opinion, leads to the conclusion that any nonconforming industrial use, noisy and unpleasant as such uses frequently are, would be a MERA violation. This is a troublesome expansion in the application of private causes of action under MERA.

Problems with the MERA analysis are twofold.

First, the supreme court has not announced a standard applicable to noise violations that makes any attempt to clearly delineate when an industrial use, or a gun club in this case, is exposed to a possible private cause of action by unhappy neighbors because their "quietude" was disturbed. Part of the problem here is that, despite the district court's detailed findings, the reality is that there were no scientific measurements taken of sound levels and no expert witness testimony as to any objective noise limit standard.[1] Without objective measurements, it is difficult to evaluate whether or not the conduct of the gun club materially adversely affected the environment. We do not know what the appropriate level of sound for the neighborhood should be, we do not know how much noise is presently created by the gun club, and we have no historical baseline against which to measure either of these variables. We do know, of course, and there is clear testimony in the record on this point, that firing ranges are noisy. That should not be the test for determining whether or not a MERA violation occurred, and it is my view that such was the test used here.

The second problem in the MERA analysis is that the principal case cited by all parties in this dispute, *Minnesota Pub. Interest Research Group v. White Bear Rod & Gun Club*, 257 N.W.2d 762 (Minn. 1977), is not at all useful in analyzing the present circumstances. Among other differences, *White Bear Rod & Gun Club* concerned an attempt by a firing range to relocate, rather than a nonconforming, existing use, and there was also expert testimony in *White Bear Rod & Gun Club* that the projected site for a gun club in that case was near one of the finest undeveloped waterfowl lakes in the Twin Cities area and was quite remote from developed areas. *Id.* at 765–67. None of that can be said in the present controversy.

There is a second problem with reliance on the *White Bear Rod & Gun Club* decision. Minn.Stat. § 116.07 subd. 2(a) (2000), requires that

[n]o standards adopted by any state agency for limiting levels of noise in terms of sound pressure which may occur in the outdoor atmosphere shall apply to * * * (4) skeet, trap or shooting sports clubs * * *.

*Id.* While the majority correctly notes that the legislative language, adopted after *White Bear Rod & Gun* was decided, does not specifically exempt gun clubs from

---

1. There was testimony from some witnesses about "decibel" levels. But those decibel measurements were taken by lay people with no apparent training, using inexpensively purchased meters, with a very significant error factor. Further, there was no evidence in the record that these meters were accurate or that they had ever been calibrated. In addition, respondents' witnesses measured the decibel levels according to a setting on the meter that does not really duplicate perceptions of the human ear, at least according to the only qualified expert to testify at trial, an engineer with work experience at the National Aeronautics and Space Administration, Lockheed Martin, and the Minnesota Pollution Control Agency. About all that can be said about these alleged "test" results is that they demonstrate that a firing range can be noisy, a fact disputed by no one.

810

MERA standards, that legislative decision ought to serve as a clear warning signal that care should be taken in judicial regulation of noise from gun clubs or similar activities.

I do not believe respondents have been able to carry their burden of establishing a prima facie case of pollution, impairment, or destruction of the environment in violation of Minn.Stat. § 116B (2000).

I would remand the permanent injunction to the district court with instructions that it be narrowed to deal solely with safety, trespass, and nuisance issues stemming from or related to firearm projectiles or gun shot escaping the perimeter of the gun club property.