**In the Matter of the Verified Petition of Robert L. RUIKKIE and Karen Ann Ruikkie for Certain Relief Pursuant to Minnesota Statutes Section 508.671, petitioners, Appellants,**

v.

**George P. NALL, et al., defendants and third party plaintiffs, Respondents,**

v.

**Mark Monacelli, as St. Louis County Registrar of Titles, et al., third party defendants, Respondents,**

**Tom Hanson, Commissioner of Finance, State of Minnesota, as Custodian of the State Torrens Assurance Fund, third party defendant, Respondent.**

### No. A10–1339.

Court of Appeals of Minnesota.

May 9, 2011.

**810**

Robert L. Ruikkie, Karen Ann Ruikkie, Brooklyn Park, MN, pro se appellants.

Mitchell J. Brunfelt, Michael Patchin, Colosimo, Patchin, Kearney & Brunfelt, Ltd., Virginia, MN, for respondents George P. Nall, et al.

William E. Defenbaugh, Jr., Ely, MN, for respondents Anthony and Penny Stolfe.

Mark S. Rubin, St. Louis County Attorney, Timothy O. Lee, Assistant County Attorney, Duluth, MN, for respondents Mark Monacelli, et al.

Lori Swanson, Attorney General, Samantha K. Juneau, Assistant Attorney General, St. Paul, MN, for respondent Tom Hanson.

Considered and decided by MINGE, Presiding Judge; JOHNSON, Chief Judge; and CRIPPEN, Judge.*

## OPINION

MINGE, Judge.

This case concerns the boundary line between two parcels of property near Mitchell Lake, about three miles south of Ely in St. Louis County. Appellants Robert and Karen Ruikkie are the record owners of Government Lot (Gov't Lot) 6.[1] George and Leslie Nall, the principal respondents in this case, are the record owners of Gov't Lot 1,[2] which is located to the north of Gov't Lot 6. Whether Gov't Lot 6 has any frontage on Mitchell Lake is at the heart of this controversy.

In 2007, the Ruikkies filed a petition pursuant to Minn.Stat. § 508.671 (2010) for the judicial determination of Gov't Lot 6's boundaries. The district court established the boundaries after finding that the Ruikkies expressly agreed to and acquiesced in a boundary between Gov't Lot 1 and Gov't Lot 6 that resulted in no access to Mitchell Lake. The Ruikkies appealed the determination of the boundary between Gov't Lots 1 and 6. Because we conclude that the district court failed to apply the proper legal principles in locating this boundary, we reverse and remand.

---

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

1. Gov't Lot 6 is located in the southeast portion of the NE ¼ of section 18, township 62, range 12.

2. Gov't Lot 1 is located in the northeast portion of the NE ¼ of section 18, township 62, range 12.

## FACTS

The Ruikkies purchased Gov't Lot 6 in April 1992. Gov't Lot 6 is located on or near the southeast corner of Mitchell Lake. The lot lies to the south of Gov't Lot 1 and to the east of Gov't Lot 5.[3] All three lots are registered, or Torrens, property, and were held by a common owner in the 1920s.

The genesis of this conflict is the 1885 United States government survey of the area. The original government survey depicts a bay in the southeast portion of Mitchell Lake that covers a substantial area in what is Gov't Lots 1, 5, and 6. Testimony in this case revealed that this bay did not exist in 1885 and does not exist today. The bay did not gradually disappear over time as a result of ecological succession; the bay has simply never been there. The original government survey is therefore erroneous.

For the sake of clarity, we include a court-generated illustration that depicts the actual shoreline of Mitchell Lake, the 1885 survey meander line of the lake, and the three government lots at issue in this case. The dotted and dashed lines in the illustration depict the disputed portions of the boundaries of Gov't Lot 6 as proposed by the parties' respective surveyors, which we will discuss in greater detail below.

When the Ruikkies first became interested in purchasing Gov't Lot 6, they received conflicting information about whether the lot included access to Mitchell Lake. The real estate agent told them that the property did not have lake frontage. The seller, William Homer, told them that it did and showed them a drawing depicting the northwest corner of Gov't Lot 6 touching Mitchell Lake. At that time, the Ruikkies did not inquire further regarding Gov't Lot 6's boundaries or lake frontage.

In May 1993, the Ruikkies were exploring the woods when they discovered an abandoned cabin that appeared to be on their property. Robert Ruikkie asked the owner of Gov't Lot 1, who operated a resort, about the cabin. The owner told Ruikkie that the cabin was on Gov't Lot 1, not Gov't Lot 6, and that the northwest corner of Gov't Lot 6 is located 85 feet back from Mitchell Lake. The owner showed Ruikkie a survey confirming his representation. Ruikkie later met with that surveyor, who stated that Gov't Lot 6 lacked lake frontage.

The Ruikkies then engaged in a series of real estate transactions to obtain access to Mitchell Lake. They purchased portions of platted lots in what was purported to be the northeast portion of Gov't Lot 5. The lots were part of a subdivision known as Homer's Lots and gave the Ruikkies 90 feet of lake frontage. However, this lake frontage was mostly on a ledge that dropped precipitously to the lake, making water access difficult. The Ruikkies cleared a path to the east of their newly purchased 90 feet in order to reach the lake more easily. The owner of Gov't Lot 1 at the time informed the Ruikkies that this path was actually on the southwest corner of Gov't Lot 1. Robert Ruikkie offered to buy this portion of Gov't Lot 1, but the owner declined.

In 2003, the Nalls purchased Gov't Lot 1 and decided to convert the property into a Common Interest Community (CIC) pursuant to Minn.Stat. ch. 515B (2010). The Nalls hired surveyor Bruce Chernak to

3. Gov't Lot 5 is in the southwest portion of the NE ¼ of section 18, township 62, range 12. In 1982, the owner of both Gov't Lot 5 and Gov't Lot 6, William Homer, created a subdivision of most of Gov't Lot 5, calling it Homer's Lots. The plat of Homer's Lots assumes a boundary between Gov't Lot 5 and Gov't Lot 6 that runs straight north to Mitchell Lake.

survey Gov't Lot 1 in preparation for filing a CIC application and plat.

George Nall met with the Ruikkies in the summer of 2003, and they discussed a possible land swap. The Ruikkies were interested in a triangular piece of land at the southwest corner of Gov't Lot 1 where they had cleared their path to the lake. At the same time, the Nalls needed more land for their planned CIC and wished to acquire 3.7 acres in the northeast portion of Gov't Lot 6, lying north of an established road. Eventually, the Ruikkies and the Nalls agreed to exchange quitclaim deeds. The Nalls asked surveyor Chernak to prepare metes-and-bounds legal descriptions for and a diagram of the land being exchanged. The parties shared the cost of legal and surveying services for this swap. Chernak's diagram showed the location of the boundary between Gov't Lots 1 and 6 as well as the land being exchanged. This diagram was attached to the Ruikkies' quitclaim deed to the Nalls and was registered. New certificates of title were issued reflecting the transaction.

Surveyor Chernak submitted the plat for the Nalls' CIC to St. Louis County officials in December 2004. The plat reflected the land swap. In May 2005, the St. Louis County surveyor, Thomas O'Malley, informed Chernak that there was a "major concern" about the location of the boundary line between Gov't Lot 1 and Gov't Lot 6. O'Malley had consulted the 1885 government survey and became concerned that Chernak's depiction of the boundary, as running straight west toward Mitchell Lake, was not consistent with the original government survey because it "completely cut[s] off Lot 6 from any shoreline," resulting "in the complete elimination of any riparian rights for Lot 6." O'Malley told George Nall that, to obtain approval of the CIC plat, the Ruikkies had to relinquish their right to any lake frontage they may have as owners of Gov't Lot 6. A waiver was prepared, but the Ruikkies declined to sign.

In the summer of 2005, the Ruikkies sought advice from surveyor Norm Livgard, a former St. Louis County surveyor, about Gov't Lot 6's boundaries. Surveyor Livgard showed the Ruikkies a copy of the original government survey, pointed out that it clearly shows Gov't Lot 6 abutting the lake, and explained that surveying principles required the preservation of Gov't Lot 6's access to the "shrinking lake." Livgard created a diagram of Gov't Lot 6, using an aerial photo of the property, and superimposed angled lot lines that would, in his opinion, comply with the government survey. These angled lines start at the points at which the boundaries of Gov't Lot 6, as set by the United States government survey, reached the meander line for the bay on Mitchell Lake and then run northwesterly toward the lake's center line. This results in Gov't Lot 6 having lake frontage.

Also during the summer of 2005, George Nall organized a meeting with his attorney, his surveyor (Chernak), the county examiner of titles, the county surveyor (O'Malley), and the deputy county registrar of titles. The purpose of the meeting was to expedite the approval of Nall's proposed CIC. County surveyor O'Malley testified that Nall "insisted that the Ruikkies had no issues with where that boundary was" located. O'Malley asked if the boundary line between Gov't Lot 1 and Gov't Lot 6 was marked and visible. Someone at the meeting responded that there was "some ribbon" and that "flagging was hanging in the brush."

There is testimony that as a result of the meeting a two-step process was identified to resolve the boundary question. First, Chernak would revise the CIC plat, removing the reference to Gov't Lot 6 and to the boundary between Gov't Lot 1 and

Gov't Lot 6, so that O'Malley could approve the plat without having to consider government-lot-boundary issues. Second, the Nalls would bring a "proceeding subsequent" to resolve any boundary issue with Gov't Lot 6.[4] This would enable the Nalls to move ahead with their CIC development and leave any boundary questions for future resolution.

Chernak prepared a second survey that eliminated references to Gov't Lot 6 or any demarcation of the boundary between Gov't Lot 1 and Gov't Lot 6. O'Malley approved the CIC plat in September 2005, without a waiver from the Ruikkies and without the initiation of the proceeding subsequent discussed in the two-step process described above. The CIC plat was recorded in November 2005. In the winter of 2005–06, the Nalls advised the Ruikkies that the CIC had been approved. Several parcels in the CIC were sold and certificates of title for the CIC were issued.

Robert Ruikkie contacted O'Malley, who explained that the CIC plat included property that was arguably part of Gov't Lot 6. Next, Ruikkie attempted to contact the title examiner's office. Ruikkie testified that the chief deputy county registrar of titles informed him that the examiner of titles acts as a judge, and that Ruikkie did not have the right to speak to him. Ruikkie's attorney met with an assistant St. Louis County attorney in early 2006 and was informed that the county attorney's office could not help with the private property issue.

In November 2006, Ruikkie hired yet another surveyor, LaVerne Leuelling, to survey Gov't Lot 6. Leuelling's survey differs from the Chernak survey by depicting the boundary between Gov't Lot 1 and Gov't Lot 6 extending westerly to the me-ander line of the non-existent bay and then deflecting northwesterly to a point in the centerline of Mitchell Lake rather than running west and never reaching Mitchell Lake. This approach resembles that taken by surveyor Livgard in 2005. The sketch prepared by this court and included in this opinion illustrates the boundaries of Gov't Lot 6. The dotted lines represent the disputed portion of Chernak's proposed boundaries while the dashed lines represent the disputed portions of Leuelling's proposed boundaries.

No proceeding subsequent was initiated by the Nalls incident to the discussions at the July 2005 meeting. However, in March 2007, the Ruikkies filed a petition to initiate a proceeding subsequent to the initial title registration in St. Louis County District Court, requesting a judicial determination of the boundary lines of Gov't Lot 6 in accordance with the Leuelling survey. The county examiner filed a report determining who should be named as defendants: owners of certain lots in the plat of Homer's Lots in Gov't Lot 5, the Nalls, the home owner's association that operates the Nalls' CIC, and the purchasers of those CIC units. The CIC defendants answered and filed a third-party complaint seeking indemnity and contribution against four officials: the St. Louis County Registrar of Titles; the St. Louis County Surveyor; the Chairman of the St. Louis County Board of Commissioners; and the Minnesota Commissioner of Finance, on behalf of the state general fund, which is liable for certain Torrens-related claims. Minn.Stat. §§ 508.75–.79 (2010). The defendants and third-party defendants moved for summary judgment, arguing that the relief sought by the Ruikkies is barred by the doctrine of practical location of boundaries

---

4. "Subsequent" is shorthand for subsequent to registration of the property within the Tor-rens system.

and the principles of estoppel, laches, and consent, or in the alternative, that they were entitled to relief under the Torrens law. The district court denied summary judgment.

Following a bench trial, the district court issued an order on April 6, 2010, which found that the Ruikkies had expressly agreed to the Gov't lot 6 boundary as shown in the diagram prepared by surveyor Chernak incident to the 2004 Ruikkie–Nall land swap and that the Ruikkies had otherwise acquiesced in this boundary. The district court also set the boundary between Gov't Lot 6 and Gov't Lot 5 in accordance with the plat of Homer's Lots that William Homer filed in 1982. The district court dismissed the claims against the various officials. The Ruikkies moved the district court for amended findings, which the district court denied. The Ruikkies appeal that part of the decision confirming the Chernak diagram depicting the boundary between Gov't Lots 1 and 6. They do not appeal the placement of the boundary between Gov't Lots 5 and 6.[5]

### ISSUES

I. Did the district court err in its placement of Gov't Lot 6's northern boundary line?

II. Independent of the location of the north boundary of Gov't Lot 6, was the Ruikkie–Nall boundary established by practical location?

III. Does Torrens law limit the determination of boundaries in this proceeding?

### ANALYSIS

The crucial issue in this case is whether the district court erred by establishing the boundary between Gov't Lot 1 and Gov't Lot 6 at the line depicted in the diagram as prepared by Chernak for the parties' land-swap agreement. We break our analysis into three determinations: (1) how the district court should determine the northern boundary of Gov't Lot 6; (2) what the parties' ownership interests are, independent of the boundary of Gov't Lot 6; and (3) what limit, if any, the Torrens status of the property places on our determination.

### I. Location of the Boundary Between Gov't Lot 1 and Gov't Lot 6

■ The first issue is whether the district court erred in its placement of the northern boundary of Gov't Lot 6. The Ruikkies began this action by filing a petition for a proceeding subsequent. An owner of registered property may petition the district court to have some or all of the property's boundaries judicially determined. Minn.Stat. § 508.671, subd. 1 (2010). "Section 508.671 shall apply in a proceedings subsequent to establish a boundary...." Minn.Stat. § 508.02 (2010). The proceeding for the judicial determination of boundaries must comply with several statutory requirements in order to satisfy due process. Minn.Stat. § 508.671, subds. 1, 2 (2010); *Phillips v. Dolphin,* 776 N.W.2d 755, 758–59 (Minn. App.2009), *review denied* (Minn. Mar. 16, 2010). Our scope of review of the district court's placement of the boundary is whether the district court's factual findings are clearly erroneous and whether the district court erred in its legal conclusions. *In re Geis,* 576 N.W.2d 747, 749 (Minn. App.1998), *review denied* (Minn. May 28, 1998). A district court's decision on a purely legal issue is not entitled to deference and will not bind this court on review. *Frost–Benco Elec. Ass'n v. Minn. Pub.*

5. Because the boundary with Gov't Lot 5 is not before us on appeal, we do not address that boundary or any significance it may have in setting the boundary with Gov't Lot 1. Our diagram only shows lines for that lot for informational purposes.

*Utils. Comm'n,* 358 N.W.2d 639, 642 (Minn.1984).

The United States government survey subdivides real estate in Minnesota and establishes the framework for its identification. The boundaries established by the original government survey controls the judicial determination of boundaries. *Slindee v. Fritch Invs., LLC,* 760 N.W.2d 903, 907 (Minn.App.2009) (citing *Benz v. City of St. Paul,* 89 Minn. 31, 36, 93 N.W. 1038, 1039 (1903)). County surveyors must make surveys "in strict conformity to the original survey made by the United States." Minn.Stat. § 389.04 (2010). When a survey is made of property that was subject to a United States government survey, "the aim of the resurvey must be to retrace and relocate the lines and corners of the original survey." *Wojahn v. Johnson,* 297 N.W.2d 298, 303 (Minn.1980).

The original government survey is the governing frame of reference even when it is inaccurate. Neither the courts nor a subsequent surveyor may correct an erroneous government survey by simply setting new section or subdivision lines. *Id.; see also Anderson v. Johanesen,* 155 Minn. 485, 486, 193 N.W. 730, 730 (1923) ("A government corner is where the government surveyors correctly *or mistakenly* place it...." (emphasis added)). For the subsequent survey "to be of any use in determining" the true boundary lines, the survey "must agree with the old survey and plat." *Kozak v. Weis,* 348 N.W.2d 798, 801 (Minn.App.1984) (quoting *Dittrich v. Ubl,* 216 Minn. 396, 405, 13 N.W.2d 384, 389–90 (1944)).

Departing from the survey lines for government subdivisions is analogous to departing from survey boundaries of sections, townships, counties, states, and even nations. Once set, changing the location is difficult and involves complex procedures.

Here, the district court found that the 1885 government survey of the area comprising Gov't Lots 1, 5, and 6 is erroneous. This finding is not challenged. The finding of error arises from the survey showing a bay extending out from the southeast part of Mitchell Lake. By all accounts, this bay does not exist and has never existed. The question is what to do. We cannot live with the fiction of a non-existent bay in describing valuable lakeshore real estate that people are buying, selling, and developing.

Errors in an original survey must be reconciled in accordance with rules, regulations, and standards established by the federal and state governments, as well as judicial precedent. *See, e.g.,* Minn.Stat. § 389.04 ("[T]he county surveyor shall follow the rules established by or pursuant to acts of Congress...."). If application of these rules does not resolve the survey problem, the district court may consider other evidence, such as the opinions of surveyors. *Cf. Sommer v. Meyer,* 125 Minn. 258, 261, 146 N.W. 1106, 1107 (1914) (authorizing courts faced with erroneous field notes to consider evidence such as eyewitness testimony as to the location of lost monuments and surveyors' testimony based on surveys from other established locations). "[W]hen two competent surveyors disagree as to where a boundary line should be, the [district] court's determination as to which surveyor is correct depends mainly on each surveyor's credibility." *Wojahn,* 297 N.W.2d at 303. Among other considerations, a surveyor's credibility is determined by the degree of adherence to government rules, standards, and precedent; the quality and accuracy of his or her factual reports about the land; and his or her capacity to fill in the gaps left by applicable rules with good judgment and sound discretion. *Cf., Erickson v. Turnquist,* 247 Minn. 529, 533–34, 77 N.W.2d 740, 743 (1956) (affirming district court's reliance on one survey over

another because latter survey was "vague, indefinite, and unsatisfactory" and was "not traceable to any of the monuments or landmarks of the original survey").

In this case, the district court received evidence from two surveyors. Chernak, the Nalls' surveyor, testified that the boundary between Gov't Lot 1 and Gov't Lot 6 extends due west from a point on the east line of the section straight toward (but not reaching) the actual shoreline of Mitchell Lake. Leuelling, the Ruikkies' surveyor, agreed with Chernak's survey in two respects: the placement of the starting point of the boundary on the east line of the section, and extending the line westward. Leuelling's survey differs from Chernak's because Leuelling deflects the boundary line in a northwestern direction at the point where the north line reaches the meander line of the non-existent bay on Mitchell Lake as shown on the original government survey. At that point on the meander line of the non-existent bay, Leuelling deflects the boundary northwesterly to a point on the centerline of Mitchell Lake. Leuelling's approach treats all government subdivisions with lake frontage on the original survey as having a latent interest in the lake bed such that if part of the lake bed is or becomes dry land, the dry land is apportioned among the subdivisions and lake access is preserved. Chernak's survey corrects for the original error by running Gov't Lot 6's northerly and easterly boundaries straight, through the meander line, until they intersect without regard to Mitchell Lake.

There is no indication in the record that the district court was presented with or considered any evidence of relevant federal or state rules or governing judicial precedent for resolving the survey question. There is no statement of whether there is any legal guidance. The parties have not addressed this matter on appeal. The district court did not make factual findings as to the relative weight and credibility of each surveyor's testimony. Instead, the district court determined the location of the boundary of a government lot on the basis of the doctrine of boundary by practical location. In applying the doctrine, the district court found that the parties had accepted the boundary line prepared by Chernak incident to the parties' 2004 exchange of deeds. The question is whether the practical-location doctrine may be used to resolve the error in the original government survey.

The doctrine of boundary by practical location is properly used to resolve a dispute between private parties as to a boundary between their land when the boundary that is set forth in an original government survey, or a platted lot line, or a line established by a metes-and-bounds legal description is inconclusive. *Slindee,* 760 N.W.2d at 907. The practical-location boundary does not alter or shift the location of the original government subdivision or a plat. A finding of a boundary by practical location recognizes the actions of landowners and results in one landowner gaining and the other losing some part of their adjoining parcels. The successful party actually becomes the owner of what from a technical survey may well be part of the other's property. Only if a government survey, plat, or metes-and-bounds description is so flawed that there is a hopeless ambiguity in locating a boundary and if there is not a federal or state standard, caselaw principle, or surveyor's analysis available to resolve the ambiguity, a practical location of the ownership line between neighboring landowners may be a basis for resolving the problem.

Here, the district court did not determine that there is no federal or state rule or caselaw principle. Parties cannot, by their conduct or stipulation, override the location of the boundary set by the original

survey any more than they can stipulate that a statute is unconstitutional. The courts have a duty to determine boundary lines of government subdivisions consistent with the law. Therefore, it was error to resort to the doctrine of boundary by practical location to set the boundary between Gov't Lots 1 and 6 before considering federal and state standards or judicial precedents. Whether the doctrine of practical location may otherwise be an appropriate basis for resolving this controversy is considered below.

Our reversal of the district court's establishment of the boundary between Gov't Lot 1 and Gov't Lot 6 does not foreclose the possibility that the district court's placement of the boundary as extending straight west from the eastern line of the section toward (but not reaching) Mitchell Lake is indeed correct. We reverse the district court's reliance on the practical-location doctrine to support its placement of the boundary.

## II. Practical–Location Doctrine

The next issue is whether the doctrine of boundary by practical location may be used to establish a boundary between the Ruikkies and the Nalls, regardless of the location of the boundary between Gov't Lots 1 and 6 in the original government survey. In 2008, the legislature codified the doctrine of boundary by practical location in Minn.Stat. § 508.02: "[T]he common law doctrine of practical location of boundaries applies to registered land whenever registered. Section 508.671 shall apply in a proceedings subsequent to establish a boundary by practical location

for registered land." 2008 Minn. Laws ch. 341, art. 3, § 2, at 1411. However, the prohibition on acquisition of title to registered land by adverse possession remains in effect.[6] We note that the Ruikkies object to the district court's application of the practical-location doctrine to their registered land because the doctrine was not codified in the Torrens laws until after they filed their petition. Section 508.02 specifically provides that boundaries may be set for registered land "*whenever* registered" (emphasis added); thus, the legislature has clearly expressed its intent for this provision to have retroactive effect. *See* Minn.Stat. § 645.21 (2010) (stating legislature must clearly and manifestly express intent for statute to have retroactive effect). We conclude that the district court did not err in determining that the amendment was effective for this proceeding.

A party may establish a boundary by practical location in one of three ways: (1) by an express agreement between the landowners on both sides of the boundary line and then by acquiescence in that agreement; (2) by acquiescence for a sufficient length of time to bar a right of entry under the statute of limitations; or (3) by estoppel. *Wojahn*, 297 N.W.2d at 304. The effect of boundary by practical location "is to divest one party of property"; accordingly, "the evidence establishing the practical location must be clear, positive, and unequivocal." *Theros v. Phillips*, 256 N.W.2d 852, 858 (Minn. 1977).

**6.** None of the parties argued that the property in dispute had been acquired by adverse possession. Thus, we will not discuss that doctrine further. We do note that the "acquiescence prong" of the practical-location doctrine may overlap or share qualities with some of the elements of adverse possession. We wish to stress that the two doctrines "are

distinct and require proof of different elements." *Denman v. Gans*, 607 N.W.2d 788, 796 (Minn.App.2000), *review denied* (Minn. June 27, 2000), and that codification of the practical-location doctrine should not inspire landowners to attempt to establish ownership to registered land by adverse possession.

In applying the principle, the district court found that the parties had expressly agreed that the certificate of survey prepared by Chernak incident to the parties' 2004 land-swap agreement depicted the northern boundary of Gov't Lot 6. The district court further found that the Ruikkies had acquiesced in this boundary location. The Ruikkies vigorously dispute this finding. The question we face is not how we would resolve this question if we were the trier of fact, but whether there is adequate evidentiary support for the finding so that it is not clearly erroneous.

## A. Express Agreement

A party must prove two elements in order to establish a boundary by practical location through an express agreement: (1) the existence of "an express agreement between the landowners [to] set an 'exact, precise line'"; and (2) acquiescence in the agreement for a considerable period of time. *Slindee*, 760 N.W.2d at 907 (quoting *Beardsley v. Crane*, 52 Minn. 537, 546, 54 N.W. 740, 742 (1893)). "An express agreement requires more than unilaterally assumed, unspoken and unwritten mutual agreements corroborated by neither word nor act"; rather, the parties must engage in "a specific discussion identifying the boundary line or a specific boundary-related action." *Id.* at 909–10. However, our caselaw does not require a formal agreement. Such a formal agreement would be a contractual basis for setting a boundary, not a *practical-location* basis. Describing this as an implied agreement may be more accurate than an express agreement. Regardless, because this agreement is not an actual contract, acquiescence in the agreed-upon boundary must be for a substantial period of time, although not necessarily the full 15 years required under the acquiescence theory. *See Beardsley*, 52 Minn. at 547, 54 N.W. at 743 (nine years following survey and establishment of fence); *Cnty. of*

*Houston v. Burns,* 126 Minn. 206, 208, 148 N.W. 115, 115 (1914) (almost ten years following survey and establishment of fence).

The district court found that when the Ruikkies and the Nalls swapped land in 2004, they made an agreement as to the boundary between Gov't Lot 1 and Gov't Lot 6, as represented in Chernak's survey. It is noteworthy that the district court did not find an actual formal contract. For our discussion, we assume that the record supports a finding of an "express" agreement. Thus, we will focus on the question of acquiescence. The Ruikkies signed a quitclaim deed granting 3.7 acres of Gov't Lot 6 to the Nalls on March 20, 2004. Three years elapsed before the Ruikkies filed their Torrens petition on March 29, 2007. But, in fact, the Ruikkies ceased to acquiesce in the boundary line set by the Chernak diagram earlier than 2007. In the summer of 2005, they refused to sign a waiver and release of their riparian rights. If signed, there would have been a firm, contractual agreement. When the Ruikkies learned that the CIC had been approved without their signatures on the waiver, they discussed the matter with their attorney, the county surveyor, the office of the county examiner of titles, and the county attorney's office. They hired two surveyors, both of whom concluded that Gov't Lot 6 has lake frontage. Finally, they filed the present action seeking judicial determination of their boundaries.

Examining the record in the light most favorable to the district court's conclusion that the "express agreement" basis was met, we conclude that there is not sufficient evidence of acquiescence. Thus, reliance on the 2004 land-swap agreement was erroneous.

## B. Acquiescence

The district court also concluded that the Ruikkies had "acquiesced to the

boundary lines of their property since their initial purchase in 1992." If a party acquiesces in a boundary "for a sufficient length of time to bar a right of entry under the statute of limitations," the district court may establish the boundary by practical location. *Wojahn,* 297 N.W.2d at 304. Because the statute of limitations is 15 years (Minn.Stat. § 541.02 (2010)), this "acquiescence" basis is more demanding than the conduct just considered.

Here, the Ruikkies commenced their action in March 2007. Thus, to establish a boundary by practical location for the statutory 15–year period, they must have acquiesced in the boundary between Gov't Lot 1 and Gov't Lot 6 since March 1992. *See id.* The record demonstrates that the Ruikkies purchased Gov't Lot 6 in April 1992. The Ruikkies had ceased acquiescing in the boundary in 2005, when they refused to sign the Nalls' waiver form and began examining their boundary with county officials and their own surveyors. Regardless, they filed this action in March 2007. They did not own Gov't Lot 6 long enough to run out the statutory period required to establish acquiescence in a boundary by practical location.

 On the present record, it does not appear that if the Ruikkies had purchased the property prior to 1992 or that if the actions of prior owners is considered, the conduct identified by the district court demonstrates that the requisite acquiescence in a boundary with Gov't Lot 1. There are three problems with this claim of acquiescence: First, the record does not indicate that the Ruikkies—or anyone else, for that matter—knew the location of the northern boundary of Gov't Lot 6. In order to demonstrate acquiescence, the boundary line must be "certain, visible, and well-known." *Beardsley,* 52 Minn. at 546, 54 N.W. at 742. The practical boundary must be "known, definite, certain, and capable of ascertainment." *Fishman v.*

*Nielsen,* 237 Minn. 1, 8, 53 N.W.2d 553, 557 (1952); *see also Wojahn,* 297 N.W.2d at 305 (finding no boundary by practical location where fence "was deteriorating and in disrepair at various times" throughout the statutory period). The record is undisputed that Gov't Lot 6 is wooded and undeveloped. There is no evidence of a fence, marker, or other identifying characteristics of Gov't Lot 6's boundary with Gov't Lot 1 or of the boundary between the Ruikkies and the Nalls or the prior resort owner. Although surveyor O'Malley reported that he was told that the claimed boundary was marked by "some ribbon" and that "some of the surveyors' flagging was hanging in the brush," no such evidence was introduced at trial. The Ruikkies could not have acquiesced in a boundary whose location was unknown to them. *See Theros,* 256 N.W.2d at 859 ("There can hardly be an acquiescence in a boundary line that is claimed to be located in several different places.").

Second, the Ruikkies never reached any understanding or agreement, however informal or implicit, with their northern neighbor as to the location of their shared boundary. A landowner cannot acquiesce to a boundary unilaterally. As this court explained in *Pratt Inv. Co. v. Kennedy,* "[a]cquiescence exists when adjoining landowners, for example, mutually construct a fence with the intention that the fence represents an adequate reflection of the property line." 636 N.W.2d 844, 850 (Minn.App.2001). Although the Ruikkies discussed their property's riparian rights with various owners of Gov't Lot 6, there was no mutual agreement as to a precise boundary between Gov't Lot 1 and Gov't Lot 6.

 Third, acquiescence is "not merely passive consent" but rather is "conduct from which assent may be reasonably inferred." *Id.; see also Fishman,* 237 Minn.

at 5, 10, 53 N.W.2d at 555, 558 (establishing boundary by practical location after neighbors constructed a fence as close as possible to presumed boundary and maintained fence for 24 years). The district court faulted the Ruikkies for taking "no action" to determine the location of their northern boundary. This is true: they did not hire a surveyor, consult with their northerly neighbor, erect a fence, or otherwise establish a clear boundary. But their inaction as shown in this record is not long enough to meet the requirement for acquiescence.

### C. Estoppel

Because the district court did not find estoppel, we do not consider it.[7] In sum, because we conclude that this record does not support the district court's determination that the Ruikkies sufficiently acquiesced in the boundary between Gov't Lot 1 and Gov't Lot 6, or the boundary between their properties, we reverse that determination.

### III. Ownership Not Conclusive on Location of Boundary Line

██ The final issue for consideration is whether the Torrens system, the filing of the CIC plat, and the issuance of certificates of title affect the result in this proceeding.

The purpose of the Torrens system was to create a title registration procedure that would simplify the conveyance of land. *Hersh Props., LLC v. McDonald's Corp.*, 588 N.W.2d 728, 733 (Minn.1999). "Torrens registration provides a means to determine the state of title through the inspection of a single document, the certificate of title," excepting seven enumerated interests identified in Minn.Stat. § 508.25 (2010). *Id.* It is well established that "the Torrens property system is distinct from the abstract property system." *In re Collier*, 726 N.W.2d 799, 803 (Minn. 2007). The Torrens laws established "rules in respect to registered land which differ widely from those which apply in the case of unregistered land." *In re Juran*, 178 Minn. 55, 58, 226 N.W. 201, 202 (1929).

The registration of title to land does not in and of itself eliminate questions of survey or boundary. Neither a plat nor a registered land survey constitutes a proceeding subsequent requiring notification of other potentially interested parties. We also note that plats of registered land are not the equivalent of registered land surveys. This litigation illustrates this point. Gov't Lots 1, 5, and 6 had been registered land for decades before this dispute arose. The problem with the original government survey of this area existed before registration and continued afterward. The issuance of certificates of title simply reflects the transactions of Torrens land using platted or other legal descriptions with whatever problems infect them.

Furthermore, section 508.671 expressly permits a district court to alter existing certificates of title based on its establishment of the boundaries. Minn.Stat. § 508.671, subd. 2. Once the district court issues an order judicially determining

---

7. The Ruikkies appear to claim that it was wrong for the St. Louis County title examiner, surveyor, and deputy recorder to have met with Nall and his associates in July 2005 regarding the status of the Nalls' CIC application. The Ruikkies have requested no relief from this alleged error. Because we are reversing and remanding this case to the district court, we do not discuss this matter further. We do recognize that a county official's expertise and availability may be of significant practical value and a public service in matters regarding real property. We do not suggest in this opinion that informal consultation with county officials is improper, so long as all interested parties have an opportunity to seek such guidance.

boundaries, the registrar of titles enters a memorial on the certificates of title to the adjoining lands showing which boundary lines have been determined. *Id.* Caselaw provides that such subsequent determination of boundaries does not constitute an impermissible attack on the Torrens system. *In re Hauge,* 766 N.W.2d 50, 55 (Minn.App.2009); *see also In re Estate of Koester v. Hale,* 297 Minn. 387, 393, 211 N.W.2d 778, 781–82 (1973) (concluding that the issuance of a new certificate of title that excludes land erroneously included in a prior certificate does not offend the Torrens system).

All the certificates of title generated out of the 2004 land swap are based on Chernak's certificate of survey and plat and have no greater preclusive effect than the certificate or plat. In fact, the St. Louis County examiner of titles testified to the district court in this matter that if a landowner is willing to assume the risk of a boundary problem, the examiner's office was not required to reject a problematic plat or precluded from issuing certificates of title based on the plat. Alternatively stated: If the Nalls were willing to assume the risk of a boundary problem, the title examiner was not required to reject the Nalls' CIC application merely because of an outstanding boundary issue with the Ruikkies' property.

The Nalls argue that the district court properly denied the Ruikkies' petition because the district court's determination of boundaries would require an alteration in the legal descriptions of Gov't Lot 1 and Gov't Lot 6. They cite to this court's *Geis* decision for the proposition that "a court may not, in a proceeding subsequent to initial registration of land, determine boundary lines, if that determination alters the legal description of the land as stated in the certificate of title, and thereby attacks the torrens certificate." 576 N.W.2d at 750. This statement from *Geis* does not reflect the present state of the law. *Geis* was decided before the amendment of Minn.Stat. § 508.02, which overrules *Geis* by expressly allowing judicial proceedings to establish boundaries by practical location. Regardless, the majority in *Geis* recognized that the decision was based on "unique facts." *Id.* at 751. Most importantly, the Ruikkies' petition does not seek to alter the legal description of the Nalls' or the Ruikkies' land; rather, it seeks merely to establish the correct location of the boundary between Gov't Lots 1 and 6. Acceptance of the Nalls' plat and issuance of certificates of title are not a shortcut or proper back-door strategy for avoiding a proceeding subsequent to determine boundaries pursuant to Minn.Stat. § 508.671.

In sum, we conclude that our decision does not violate Minnesota law regarding Torrens property.

## IV. Remand

On remand, the district court shall determine whether any federal or state rule, regulation, or judicial precedent determines how to establish the boundary between Gov't Lots 1 and 6 consistent with the original 1885 government survey. If there is no such applicable rule, the district court shall determine which survey should govern resolution of this dispute. If necessary, the district court shall also evaluate the opinions of the two surveyors. The district court may open the record to receive evidence of federal and state rules and for such other matters as it determines necessary or appropriate. Finally, if the district court determines that the parties' focus on the boundary between Gov't Lot 1 and 6 so affected the parties' presentation and its consideration of the doctrine of practical location on the boundary between the Ruikkies' and the Nalls' property, we remand, allowing the district court in its discretion to reopen the record

for further consideration of the doctrine of boundary by practical location.

## DECISION

We reverse the district court's establishment of the boundary between Gov't Lot 1 and Gov't Lot 6 by practical location and remand to the district court to consider the Ruikkies' petition to establish boundaries of the two lots consistent with this opinion and for such further proceedings regarding the doctrine of boundary by practical location as the district court allows.

**Reversed and remanded.**